**NATIONAL COAL ASS'N et al. v. FEDERAL POWER COMMISSION.**

No. 10376.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 20, 1950.

Decided June 18, 1951.

John Geyer Tausig, Washington, D. C., with whom Messrs. Thomas J. McGrath, James W. Haley and Welly K. Hopkins, Washington, D. C., were on the brief, for petitioners.

Bradford Ross, General Counsel, Federal Power Commission, Washington, D. C., with whom William S. Tarver, Asst. Gen. Counsel, Federal Power Commission, and Norman A. Flanigan, Atty., Federal Power Commission, Washington, D. C., were on the brief, for respondent.

Hamilton E. Little, Memphis, Tenn., with whom Phil B. Whitaker, Chattanooga, Tenn., was on the brief, for intervenor East Tennessee Natural Gas Co. Bailey Walsh, Memphis, Tenn., and F. Trowbridge vom Bauer, Washington, D. C., also entered appearances for intervenor East Tennessee Natural Gas Co.

H. Graham Morison, Asst. Atty. Gen., and Paul A. Sweeney and Samuel D. Slade, Attys., Department of Justice, Washington, D. C., were on the brief for intervenor United States of America.

Before CLARK, BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

This case arises upon a petition to review and set aside an order of the Federal Power Commission granting a certificate of public convenience and necessity under § 7(e) of the Natural Gas Act.[1] That certificate authorized the East Tennessee Natural Gas Company to construct and operate a 22-inch natural gas pipeline, approximately 172 miles in length, in order to service the Atomic Energy Commission's plant at Oak Ridge, Tennessee. Petitioners who now seek review of that order

1. 15 U.S.C.A. § 717f(e).

are (1) the National Coal Association, a trade association of bituminous coal mine owners and operators, some of whom are said to sell to the Oak Ridge plant; (2) the United Mine Workers of America, a labor union of coal miners, including many allegedly employed in the mines referred to in (1); and (3) the Railway Labor Executives Association, whose membership is composed of the chief executive officers of twenty-one of the so-called standard railroad labor unions, many of whose members are allegedly employed by railroads which compete with the pipelines as carriers of fuel. Pursuant to the provisions of the Act,[2] petitioners were granted leave to intervene and did participate as parties to the proceeding before the Commission. Upon entry of the order granting the certificate, they filed a joint application for rehearing in accordance with the provisions of § 19(a) of the Act[3] which was denied after consideration on the merits. Following this action, the petition to review was filed here. We treat petitioners' intervention below and appeal here as in a representative capacity—in behalf of those of its members who will allegedly be affected by the order.

As authority for their right to obtain judicial review, petitioners rely upon § 19(b) of the Act which provides that: "Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the circuit court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of

the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part * * *."[4] The Commission vigorously asserts, however, that the injury to petitioners, which is said to result from the displacement of coal by natural gas, is too remote and conjectural to qualify them as parties "aggrieved" within the meaning of 19(b). The Commission concedes "that the courts in construing 'party aggrieved' or similar language in court review sections of other regulatory statutes have relaxed the established requirements for 'standing to sue' to permit a party who has suffered only financial [or economic] injury to obtain judicial review * * *."[5] But, it continues, there is still the constitutional requirement of case or controversy to prevent remote and hypothetical controversies from reaching the courts and that is not satisfied unless the injury complained of is immediate, direct and substantial.

It is unnecessary for us to undertake a re-examination at this time of what has already been done so well by Judge Frank in his comprehensive discussion of the considerable body of case law which has developed with regard to the problem of standing to challenge administrative orders. See Associated Industries v. Ickes, 2 Cir., 1943, 134 F.2d 694. We agree with the rationale which that case draws from the Supreme Court's decisions in the Sanders[6] and Scripps-Howard[7] cases: " * * * one threatened with financial loss through increased competition resulting from a Commission's order is 'aggrieved,' and entitled as such to a review notwithstanding that the very statute pursuant to which he obtains review is designed to keep competition alive and con-

2. Section 15(a) of the Natural Gas Act, 15 U.S.C.A. § 717n(a).

3. 15 U.S.C.A. § 717r(a).

4. 15 U.S.C.A. § 717r(b).

5. Respondent's Brief, pp. 13–14. The "established requirements" referred to are found in Alabama Power Co. v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, and Tennessee Electric Power Co. v. Tennessee Valley Authority, 1939,

306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543.

6. Federal Communications Commission v. Sanders Brothers Radio Station, 1940, 309 U.S. 470, 476–477, 60 S.Ct. 693, 84 L.Ed. 869, 1037.

7. Scripps-Howard Radio, Inc. v. Federal Communications Commission, 1942, 316 U.S. 4, 14–15, 62 S.Ct. 875, 86 L.Ed. 1229.

fers upon him no property right which gives him any kind of immunity from competition." [8] The " 'person aggrieved' review provision [is] a constitutionally valid statute authorizing a class of 'persons aggrieved' to bring suit in a Court of Appeals to prevent alleged unlawful official action in order to vindicate the public interest, although no personal substantive interest of such persons had been or would be invaded. Although one threatened with financial loss through increased competition * * * cannot, solely on that account, make the proper showing to maintain a suit against the official, absent such a statute, yet the 'person aggrieved' statute gives the needed authority to do so to one who comes within that description." [9]

The doctrine that a competitor belongs to the class of persons whose injury is sufficiently direct and immediate to qualify as "aggrieved" has been applied in a case brought under § 19(b) of the Natural Gas Act. In Cia Mexicana De Gas v. Federal Power Commission, 5 Cir., 1948, 167 F.2d 804, 805–806, the court thought it "clear" that a natural gas company which competed with a certificate applicant was entitled to seek judicial review of the order granting the certificate.

Nothing in United States Cane Sugar Refiners Ass'n v. McNutt, 2 Cir., 1943, 138 F.2d 116, runs counter to what we have already said. That case merely emphasizes the importance of the requirement that, to qualify as a person "adversely affected" by an administrative order, a petitioner must show that such order results in direct and immediate injury to him. Petitioners there were sugar refiners seeking review of an order of the Food and Drug Administration authorizing canners to use dextrose or corn sirup or both in combination with sugar without being required to so state on the label. It was argued that the order would result in diminished use of petitioner's product, the more expensive sugar. The sugar refiners were not consumers of the regulated product, as was true in Associated Industries; nor were

they competitors in the production and sale of it, as was true in Sanders and Scripps-Howard. They were merely suppliers of an ingredient used in the manufacture of it. As such, they could point to no higher prices they would have to pay as a result of the order complained of or even, with any certainty, to loss of markets previously enjoyed. They could show no immediate adverse effect of the order upon them but only a "tenuous likelihood" that "the regulations will do away with the remote, speculative sales resistance of the public to the marketing of the canned fruits sweetened in some part with dextrose or corn sirup which might be present if the labels on the cans disclosed" that these sweeteners had been added to the sugar.[10] Such a remote possibility of injury was neither substantial, direct nor immediate and hence did not bring petitioners into sufficiently close relationship to the subject matter of the order to permit them to "vindicate the public interest."

Petitioners in the case before us trace their injury to the displacement of coal by natural gas which will result from the issuance of the certificate. The coal companies will lose markets previously enjoyed by them at Oak Ridge. Their employees will be deprived of jobs to the extent that new markets are not found, and the employees of railroad companies, which compete with the pipelines as carriers of fuel to Oak Ridge, will similarly be affected. So far as the competing coal companies (represented by petitioner National Coal Association) are concerned, there is no question that the effect of the order upon markets previously enjoyed by them brings them within the rule of Sanders and Scripps-Howard and outside the scope of Cane Sugar Refiners. This is especially true in the context of this particular industry. Congress was concerned with, and wished the Commission to consider, "the effect of construction and extension [of natural gas pipelines] upon the interests of producers of competing fuels and competitive transportation interests." [11] The

---

8. 134 F.2d at page 705.
9. Id. at page 705.
10. 138 F.2d at page 121.

11. H.R.Rep.No.1290, 77th Cong., 1st Sess., p. 3, Oct. 21, 1941.

source of such concern was congressional recognition that the market for coal was a shrinking one and that displacement of it by natural gas would create problems directly affecting both the coal industry and the railroads which transported coal—problems which would at least require that such competitors be heard upon a showing of injury to them.

We see no reason, and none is suggested to us, for considering the interest of employees in retention of their employment in the competing companies as any less substantial than the interest of competitors in retaining their markets or the prospect of loss of employment any less direct and immediate than the loss of markets with which the competing companies are threatened. The employees of competing companies, as much as the owners thereof, have a sufficiently direct relationship to the subject matter of the Commission's order to be "aggrieved."[12]

Another objection to the review sought here is that, even if petitioners come within a class which might be entitled to review, the record before the Commission contains no evidence that these petitioners are in fact adversely affected or "aggrieved" by the Commission's order. What does appear in the record is that the displacement of coal by natural gas at Oak Ridge will result in the annual loss of (1) sales of 700,000–750,000 tons,[13] (2) over 130,000 man days of work in the coal mines,[14] (3) revenue to coal mine operators of more than $3,000,000,[15] (4) $900,000 in revenue to the Southern Railway,[16] and (5) almost $119,000 in revenue to the Louisville & Nashville Railroad Company.[17] Each of the petitioners alleged in its petition to intervene before the Commission[18] and also in its petition for review of the Commission's order[19] that some of its members would be affected by the losses of markets and employment described above. These allegations have at no time been denied by the Commission. Its position is that it was incumbent upon petitioners to produce evidence at the hearings that their members would be so affected. For example, the Commission points out that Oak Ridge's coal supply had been purchased from three companies and urges that "It is reasonable to suppose that if any of these three companies had been members of the National Coal Association evidence to that effect would have been produced."[20]

The commission cannot now shift to petitioners the responsibility for its own failure to contest petitioners' allegations. The corollary of its authority to allow intervention is the duty to explore all pertinent aspects of an intervenor's relationship to the matter under consideration, including the authority of an association or labor union to represent its affected members. The Commission would now rely upon its own failure to make a record on these points to deprive petitioners of standing to seek judicial review, even though petitioners are otherwise within a class entitled to review. This it may not do. Under the circumstances of this particular case, we accept the allegations of the petition for review as true and consider petitioners, in their representative capacities, to be "aggrieved" within the meaning of § 19(b) and the applicable case law.[21]

One additional procedural argument is pressed upon us by the Commission. It is said that the Commission is authorized to permit or deny intervention at its discretion[22] and that, since these petioners had no right to intervene, they can

---

12. See quotations from the Associated Industries case, supra, 134 F.2d at page 705.

13. J.App. pp. 143, 245.

14. Id. at 246.

15. Id. at 143.

16. Id. at 215–217.

17. Id. at 273.

18. Id. at 90, 94.

19. Id. at 4–5.

20. Respondent's Brief, p. 10.

21. Cf. Associated Industries v. Ickes, 134 F.2d at pages 712–713.

22. 15 U.S.C.A. § 717n(a) provides: "In any proceeding before it, the Commission in accordance with such rules and regulations as it may prescribe, may admit

have no right to judicial review. The Commission itself admits, however, that it may not abuse its discretion. This, to us, means that there are some persons who have a right to participate in Commission proceedings and some who do not. We think it clear that any person who would be "aggrieved" by the Commission's order, such as a competitor, is also a person who has a right to intervene. Otherwise, judicial review, which may be had only by a party to the proceedings before the Commission who has been "aggrieved" by its order,[23] could be denied or unduly forestalled by the Commission merely by denying intervention. Since we have already determined that petitioners are "aggrieved" and, since they were parties to the proceedings below, there is no occasion to consider a case in which they were not permitted to intervene.

Coming now to the merits, petitioners say that before the Commission can grant a certificate of necessity, it must consider as separate and independent elements (1) the effect of issuance of the certificate upon competing fuels and transportation and related labor interests, and (2) the relation of the project to conservation of natural gas. Although considerations such as those suggested by petitioners may well be part of the complex out of which the Commission's judgment as to "public convenience and necessity" arises, they are nowhere made standards governing the issuance or denial of certificates. Even if the Act be construed to confer a right upon competing fuels and transportation to participate in Commission proceedings and to vindicate the public interest on review, it does not follow that the interests of such groups in retention of markets may bar issuance of a certificate found to satisfy the explicit criteria furnished by § 7(e) of the Act.[24] That section provides that: "* * *

a certificate shall be issued * ' * * if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service * * * is or will be required by the present or future public convenience and necessity * * *."[25] The Commission found that the certificate applicant "is able and willing properly to do the acts and to perform the service proposed" and further, that the proposed construction and operation "are required by public convenience and necessity." These findings satisfy the statutory requirements and "if supported by substantial evidence, shall be conclusive."[26]

■■ We are convinced from our examination of the record that the findings of the Commission are supported by substantial evidence and should not be disturbed. A detailed discussion of the evidence would serve no useful purpose and would unduly burden this opinion. It is enough to say that the Commission properly assessed great weight to the Atomic Energy Commission's view that the safety and well-being of the nation required use of natural gas as a fuel at its Oak Ridge plant, and that the proposed pipeline would adequately provide the gas needed for the manufacture of fissionable materials.

We find no merit in the other objections urged by the petitioners.

Affirmed.

CLARK, Circuit Judge.

This is a petition to review an order of the Federal Power Commission, (hereafter called the Commission) entered May 3, 1949, issuing a certificate of public convenience and necessity under Section 7,

---

as a party any interested State, State commission, municipality or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest."

23. 15 U.S.C.A. § 717r(b), quoted supra, p. 2.

24. Cf. Federal Communications Commission v. Sanders Brothers Radio Station, 309 U.S. at pages 475–476, 60 S.Ct. at pages 697–698, 84 L.Ed. 869, 1037.

25. 15 U.S.C.A. § 717f(e).

26. 15 U.S.C.A. § 717r(b).

of the Natural Gas Act of June 21, 1938, 52 Stat. 821, 15 U.S.C.A. § 717(f) to East Tennessee Natural Gas Company (hereafter called East Tennessee), in its Docket No. G-1065, In the Matter of East Tennessee Natural Gas Company. The certificate authorized East Tennessee to construct and operate natural gas pipeline facilities for daily delivery and sale of up to 60,000 mcf. of natural gas to the United States Atomic Energy Commission (hereafter called AEC) for use as a fuel in AEC's gaseous diffusion plant at Oak Ridge, Tennessee, where uranium-235, one of two fissionable materials used in atomic weapons, is produced.

On July 2, 1948, the Tennessee Gas Transmission Company, (hereafter called TGT) filed an application, Docket No. G-1070, In the Matter of Tennessee Gas Transmission Company with the Commission for a certificate of public convenience and necessity authorizing the construction and operation of natural gas pipeline facilities to permit it to sell and deliver natural gas to East Tennessee for the Oak Ridge service. At this time TGT had on file with the Commission another certificate application in Docket No. G-962, In the Matter of Tennessee Gas Transmission Company, in which it sought authority to construct and operate facilities to increase its system capacity from 660,000 mcf. to 1,000,000 mcf. of natural gas per day. The application of TGT in Docket No. G-1070 for facilities to permit it to sell 60,000 mcf. of gas per day to East Tennessee covered capacity in excess of that which was the subject of the amended application in Docket No. G-962.

The Commission by order of February 21, 1949, consolidated the application of East Tennessee in Docket No. G-1065 and TGT in Docket No. G-1070 for purposes of hearing. The petitioners, here, were permitted to intervene in the proceedings on the applications of both East Tennessee and TGT by order of the Commission which limited the intervention as follows: "The participation of such interveners shall be limited to matters affecting asserted rights and interests specially set forth in the petitions for leave to inter-

vene, and provided further that the admission of such interveners shall not be construed as recognition by the Commission that they or any of them might be aggrieved because of any order or orders of the Commission entered in the proceedings."

On May 3, 1949, the Commission entered an order in Docket No. G-962 issuing to TGT a certificate for the construction and operation of so much of the facilities applied for in that Docket as was necessary to enable TGT to deliver 60,000 mcf. of natural gas per day to East Tennessee for resale to AEC at Oak Ridge. Concurrently on May 3, 1949, the Commission entered an order in Docket No. G-1065 granting a certificate to East Tennessee for construction and operation of the Greenbrier-Oak Ridge line taking official notice on that order of its findings and order in Docket No. G-962 by which it made a gas supply available for the Oak Ridge Service.

On June 2, 1949, the petitioners filed an application for rehearing of the Commission's order and on June 13, 1949, filed a motion for reopening of the proceeding in Docket No. G-1065. Both were denied on June 29, 1949, and petitioners filed a petition to review with this Court. The respondents contend that the petitioners have no standing to maintain this petition.

It is to be especially noted that neither the National Coal Association nor the United Mine Workers of America alleged, nor was any effort made to prove, that a single miner or a single mine owner belonging to either of these associations would be in any way affected by the construction of this pipe line. They content themselves with allegations and proof that they do in fact represent among their members a high percentage of miners and mine owners. These parties have no standing whatever in court.

Certainly under the doctrine of Alabama Power Co. v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, the petitioners have no such direct legal interest in the subject matter as would enable them to maintain this petition. Indeed they have no right to supply Oak Ridge with coal at all.

Section 10(a) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(a) provides: "Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."

Section 19(b) of the Natural Gas Act, 52 Stat. 831, 15 U.S.C.A. § 717r(b) is such a relevant statute, and it provides that "Any *party* * * * *aggrieved* by an order issued by the Commission" is entitled to maintain a petition to review.

Two cases, decided by the Fifth Circuit, have dealt with the term "party aggrieved" in relation to the Natural Gas Act, supra. Cia Mexicana De Gas, S. A. v. F. P. C., 5 Cir., 1948, 167 F.2d 804 and Arkansas Louisiana Gas Co. v. F. P. C., 5 Cir., 1940, 113 F.2d 281. Although that court held in the former case that the petitioners were aggrieved no reasons were assigned. In the latter case the court decided that the petitioner was not aggrieved by the order imposing conditions but by the permit which had been issued. Consequently the petitioner could not maintain the petition to review. Neither of these cases is helpful here.

In F. P. C. v. Pacific Power & Light Co., 1939, 307 U.S. 156, 59 S.Ct. 766, 83 L.Ed. 1180, the United States Supreme Court construed Section 313(b) of the Federal Power Act, 16 U.S.C.A. § 825*l*(b). That court held that the order denying the approval of the application sought by the petitioners made them parties aggrieved. But this case is not in point here, as the petitioners have not suffered such a direct injury.

The term "party aggrieved" has not been adequately interpreted in regard to the Natural Gas Act for the purposes of this decision. To determine who is a "party aggrieved", it must first of all be shown that he is aggrieved by an order of the Commission and secondly that the injury, of which the party is aggrieved, is reasonably certain and definite. If the second requirement be stated negatively, the aggravation complained of must not be nominal or purely speculative.

The petitioners have cited figures to show us that the Southern Railway will be deprived of $900,000 revenue yearly; that the Louisville & Nashville Railway will lose $119,000 in yearly revenues. Some 750,000 tons of coal will theoretically be displaced annually at Oak Ridge and some 130,000 man days of coal mining will, according to the petitioners' contention, be wiped out. In short, they claim their economic interests will be adversely affected if some other fuel is allowed to compete with coal.

The petitioners' loss of business is not reasonably certain and definite since it has not been shown that the reduction caused by the loss in this instance could or would not be made up by sales to other outlets. Viewed in the alternative, the injury, here, is only nominal and is purely speculative.

The necessity of these requirements is obvious. There must be a limit to the number of petitions for review which can be maintained. Were it otherwise the courts would be hopelessly swamped. Nor could Congress have intended that every party aggrieved should be entitled to petition for review because in some remote and uncertain likelihood the order would hurt the market for his goods.

It must be remembered that no seller or producer of coal or any other fuel or of railroads or any other form of transportation has a vested right to force consumers to retain dependence on a fuel or a form of transportation in which they have lost confidence. If they lose business it is largely because of their own antics in creating frequent crises, by way of strikes or threats of strikes, which leave the users at the mercy of their whims.

Moreover in this case there is a special consideration insofar as public convenience and necessity is concerned. The Record shows that the Oak Ridge plant is a huge plant engaged in producing materials vital to the nation's safety, perhaps even its life. It is further shown that it is absolutely necessary to operate the plant seven days a week, twenty-four hours a day and that if the boilers should be shut down for even

five minutes it would require at least two to three years to get them in full operation again.

Under such circumstances it is folly to say that this vital defense effort shall be left to the tender mercies of the contending parties here with the strong possibility that at some crisis in our affairs this important security agency might be suddenly paralyzed. The Federal Power Commission wisely and properly followed the recommendation and request of the Atomic Energy Commission.

Consequently, in my opinion, the petitioners are not "parties aggrieved" within the meaning of Section 19(b) of the Natural Gas Act, supra, and have no standing to maintain this petition.

Concurring in the result.