271 F.2d 942
 CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
CITY OF NEW YORK, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
TRANSCONTINENTAL GAS PIPE LINE CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
National Coal Association, United Mine Workers of America, Fuels Research Council, Inc., Intervenors,
Southern California Gas Company and Southern Counties Gas Company of California, Intervenors.
 No. 12908.
 No. 12929.
 No. 12930.
 United States Court of Appeals Third Circuit.
 Argued September 25, 1959.
 Decided November 3, 1959.
 
 Randall J. LeBoeuf, Jr., New York City (Halcyon G. Skinner, LeBoeuf, Lamb & Leiby, New York City, on the brief), for petitioner Consolidated Edison Co. of New York.
 Francis I. Howley, New York City (Charles H. Tenney, Corporation Counsel, New York City, on the brief), for petitioner City of New York.
 Richard J. Connor, Washington, D. C. (John T. Miller, Jr., Gallagher, Connor & Boland, Washington, D. C., James B. Henderson, General Counsel, William N. Bonner, Jr., Houston, Tex., on the brief), for petitioner Transcontinental Gas Line Corp.
 Howard E. Wahrenbrock, Washington, D. C. (Willard W. Gatchell, General Counsel, Howard E. Wahrenbrock, Solicitor, Robert L. Russell, Asst. General Counsel, David J. Bardin, Atty., Washington, D. C., on the brief), for respondent.
 Jerome J. McGrath, Washington, D. C. (Robert E. Lee Hall and Welly K. Hopkins, McGrath & McGrath, Washington, D. C., Robert M. Landis, Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., on the brief), for National Coal Assn., United Mine Workers and Fuels Research Council, intervenors.
 Morgan, Lewis & Bockius, W. James MacIntosh, J. David Mann, Jr., John E. Holtzinger, Jr., Philadelphia, Pa., Washington, D. C. (T. J. Reynolds, Harry P. Letton, Jr., L. T. Rice, Los Angeles, Cal., Henry F. Lippitt, 2nd, New York City, Milford Springer, Robert M. Olson, Jr., and Joseph R. Rensch, Los Angeles, Cal., on the brief), amici curiae.
 Before GOODRICH, STALEY, and HASTIE, Circuit Judges.
 GOODRICH, Circuit Judge.
 
 
 1
 We have before us three cases which were consolidated for argument. The main case is a petition by Transcontinental Gas Pipe Line Corporation (Transco) to set aside an order of the Federal Power Commission which refused to issue it a certificate of public convenience and necessity. Another case is a petition by Consolidated Edison Company of New York, Inc. (Con Edison) seeking the same relief. The same is true of the petition brought by the City of New York. Joining with the Commission are intervenors National Coal Association, United Mine Workers of America and Fuels Research Council, Inc. Filing a brief also as amici curiae are Southern California Gas Company and Southern Counties Gas Company of California. For the opinion and order below see Transcontinental Gas Pipe Line Corp., 21 F.P.C. 138, rehearing denied 21 F.P.C. 399 (1959).
 
 
 2
 The essential facts can be briefly stated. Con Edison went into Texas and made a contract with producers for the purchase of natural gas in the Texas field. Then it made an agreement with Transco providing for what is called "X-20 service." Transco agreed to transport the gas to New York and deliver it there to Con Edison. Included in the agreement was a provision for a sixty-day-a-year service which Transco agreed to render Con Edison from its own gas reserves and during the time this service was furnished the Con Edison supply from Texas would not be used. Con Edison agreed with the producers not to sell this gas at retail in New York. It is to be used to fire two of the ten boilers in Con Edison's Waterside plant near 42nd Street and East River in New York City. The City of New York is interested in the litigation because by the substitution of gas for coal, now being used to fire the boilers which Con Edison has at this plant, the very considerable amount of fly ash and the very considerable amount of sulfur dioxide poured into the air in this densely populated portion of New York City will be greatly reduced.
 
 
 3
 In the opinion and order denying the certificate the Commission agreed that the "conventional requirements" of public convenience and necessity had been satisfied by the showing made.[1] The matter of markets, facilities, gas supply and rates[2] are included in these "conventional requirements." The Commission, however, overruling its presiding examiner, denied the certificate and gave five policy reasons for doing so. Since the soundness of these reasons is the heart of the controversy, we set them out in full in the Commission's language. Here they are:
 
 
 4
 1. "Certainly, if we were to grant this request we would soon be confronted with many requests of the same general character; and granting the X-20 proposal, we would have no fair or rational basis for denying similar such requests."
 
 
 5
 2. "Likewise, the authorization of this and like proposals would preempt for this usage capacity which would otherwise be available to meet more urgent and widely beneficial public needs[3] even though the bare authorization here sought would not of itself entirely nullify the Leidy Storage project."
 
 
 6
 3. "The impact of large demand on relatively limited supply is certain enough to raise rates and field prices if only one bidder is bringing that demand to bear on the supply. How much more serious is that impact when it is in the form of multiple bidders, each attempting to reserve to itself a firm supply. Inevitably, there would be upward pressure on rate levels in the fields. We do not believe we ought to encourage such when it is unnecessary."
 
 
 7
 4. "Large purchasers of gas, like Consolidated Edison, can readily compete with pipelines for gas purchases. * * * But the smaller purchaser may not be as fortunate. He will have to rely on the pipeline supplier. And how long the pipeline can continue to buy in competition with nonjurisdictional, large volume purchasers, or indeed, how willing it might be to undertake such less desirable service, is at least a question."
 
 
 8
 5. "These are all factors that weigh against the grant. They would confound and make more difficult a decision in such a case as this even if the gas were to be used for a demonstrably superior use. But when the purpose for which the sale would be made is something less than desirable, they take on more serious, even controlling, significance."[4]
 
 
 9
 When the basis of the controversy is understood it gets down to a point which is easily stated although difficult to answer. It is agreed by all parties that the purchase by Con Edison of the gas in Texas is not subject to the jurisdiction of the Commission. Con Edison can buy as much gas as it can pay for in Texas and there is nothing the Commission can do about it. The same is true of the use which Con Edison makes of this gas when it gets to New York. Since it is not to be the subject of re-sale in that state, the Commission has nothing to say about its use either.
 
 
 10
 Section 1(b) of the Natural Gas Act[5] sets out specifically its coverage as follows:
 
 
 11
 "The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." 15 U.S. C.A. § 717(b).
 
 
 12
 As the presiding examiner pointed out in his opinion,[6] if Con Edison could liquefy this gas and transport it by truck or by ship to New York City there would be nothing for the Commission to take hold of. The question, therefore, comes down to the scope of the authority of the Commission given by Section 7 of the Act which provides for the certificate of convenience and necessity.[7] How far does this phrase let the Commission go?
 
 
 13
 Anyone can see that the phrase is a vague one, something like "due process of law," out of which one can get what he cares to put in. It is, obviously, the kind of a phrase where experience through the years builds up criteria which must be met in determining its content. Such experience-built criteria were what the Commission looked at when it saw that the "conventional requirements" for convenience and necessity had been met.
 
 
 14
 Our conclusion in these cases is that the Commission has gone beyond its authority in denying the certificate here. We think that what the Commission has in effect done is to assert, by its examination and disapproval of the end use to be made of this gas, a general allocation and conservation authority over the natural gas fields of the United States. Inspection of the reasons assigned by the Commission for its denial shows clearly, we think, that it disapproves of the use to be made of this gas in New York City as boiler fuel, as contrasted with the use possibly to be made of it were it to be devoted, at some future time, to house heating and domestic use.
 
 
 15
 The Commission's argument to this Court talks about interstitial legislative authority to be exercised by a regulatory body. This is quite all right; we agree that the administrative process may clothe the skeleton of a statute with flesh, as the Commission argues. But the interstitial process cannot put new provisions into a statute. That general statement everybody would agree upon. The question is, has it done so here?
 
 
 16
 The Commission's brief talks about the "inadequacy of state power to reconcile conflicting state interests."[8] This bold assertion requires us to examine carefully the legislative history behind the statute.
 
 
 17
 The 1936 report of the Federal Trade Commission to the Senate, which is specifically singled out in the introductory clause of section 1(a) of the Natural Gas Act as a source of the policy of the Act,[9] is relied on by the Commission as authority for its consideration of the end use to be made of the gas in exercising its certificating jurisdiction. It cannot be disputed that the report, which runs over 600 pages, makes a brief mention of the conflict between industrial and household uses.[10] But it is only a brief mention that is made; in neither its summary of findings[11] nor in its conclusions and recommendations[12] does the report make any mention of the matter. It is true that in its enumerated conclusions the report refers to "conservation." But a closer reading of that conclusion, together with the emphasis of the rest of the report, reveals that what was really being referred to was physical waste in the production aspects and the use of gas in gasoline extraction and the manufacture of carbon black.[13] In its listing of 16 specific evils in the industry the report refers to "a great waste of natural gas in production," but nowhere refers to end use problems.[14]
 
 
 18
 The sole recommendation of the report with respect to "conservation" was that the producing states enter into interstate compacts with each other[15] with accompanying "Federal legislation prohibiting the transportation in interstate or foreign commerce of natural gas produced or released from storage in excess of the State's quota or produced in violation of other State conservation laws and regulations."[16] It also recommended that a federal agency "be empowered to investigate the supply of and demand for natural gas throughout the country, to keep such information current, and to advise and recommend to State regulatory boards regarding the proper amount to be fixed by them from time to time as the several State quotas."[17] The result of this advice was the enactment of Section 11 of the Natural Gas Act which empowered the Federal Power Commission to assemble information and report to Congress with respect to interstate compacts,[18] and nothing more. Thus Congressman Mapes, a member of the House Interstate and Foreign Commerce Committee which drafted the bill, was able to state to the House, sitting as the Committee of the Whole, that "the only provision of the bill [which was eventually enacted] which seems to look to the conservation of the natural gas resources of the country is contained in the provision relating to the State compacts."[19]
 
 
 19
 That the 1938 Act did not give the Commission power to deal with conservation considerations was well recognized by the Commission itself in its 1940 Annual Report in which it recommended a broadening of the Act to give it power to resolve conservation problems.[20]
 
 
 20
 The statute was amended in 1942.[21] But that the 1942 amendments did not give the Commission its requested power is also apparent. Neither the committee hearings[22] nor the committee reports[23] make any mention of the Commission's concern with respect to conservation. But even more important is the Commission's own concession of lack of such power which appears in its 1944 report to Congress;[24] this report followed closely on the heels of the Hope[25] decision on which the Commission so heavily relies.
 
 
 21
 This Court does not say that the interstate compact was, or is, the best way to handle the conservation problem. What we do say is that this is what the Congress provided.
 
 
 22
 In 1944, the same year as the Commission's report to Congress, considerations of the end use to which the gas was to be applied began to appear in the Commission's orders and opinions in certificate proceedings. Although in the initial case the Commission refused, because of the pendency of its Natural Gas Investigation, to give any weight to the contention that use of gas for boiler fuel purposes was undesirable,[26] in later cases such a contention was clearly considered as a factor weighing against the granting of a certificate.[27] Other factors weighing for or against the proposed boiler fuel use in these cases included such matters as national defense, discrimination against other industrial customers, effect on existing customers, whether the service was to be part time or full time, proximity of the proposed customer to coal fields, effect on the pipe line's revenues, and the relative demand for natural gas by domestic and other industrial consumers in the area to be served.
 
 
 23
 In only four of these cases was the application for a certificate actually denied, and in one of them, the certificate was eventually granted on a rehearing a few years later.[28] In another case, the customer seeking to purchase the gas for boiler fuel was eventually successful in obtaining it, although in smaller amounts, from another pipe line subject to the Commission's jurisdiction.[29] In still another instance a pipe line's application to supply gas to two customers for boiler fuel use was denied,[30] but that same pipe line was eventually granted a certificate to supply one of the two customers.[31] In the fourth case, the denial remained unchanged.[32]
 
 
 24
 All of these cases are quite distinguishable from the facts presented in the New York situation before us.[33]
 
 
 25
 We have no decided court case to give us a precedent or guidance in the matter here under discussion. Counsel for the Commission so stated and we think accurately.
 
 
 26
 In Department of Conservation v. FPC, 5 Cir., 148 F.2d 746, 749, certiorari denied 1945, 326 U.S. 717, 66 S.Ct. 22, 90 L.Ed. 424, Memphis Natural Gas Company had been granted a certificate of public convenience and necessity. The Louisiana Department of Conservation petitioned the court for an order vacating the Commission's action, contending that the application should have been denied because the gas was to be used for boiler fuel, an "inferior" use. The court in upholding the Commission's action stated: "Assuming, without deciding, that the commission could properly consider as one of the facts entering into the granting or denial of the certificates the uses to which the gas was to be put, that is, that considerations of conservation had a place in such granting or refusal, we think it quite plain that the statute does not make such matters determinative."[34]
 
 
 27
 In National Coal Ass'n v. FPC, 1951, 89 U.S.App.D.C. 135, 191 F.2d 462, East Tennessee Natural Gas Company had been granted a certificate of public convenience and necessity. This time it was the coal and railroad interests who asked for a vacating order on the ground that the Commission had not considered the effect of the issuance of the certificate on competing fuels and transportation and had not considered the relation of the project to conservation of natural gas. Judge Bazelon, for Judge Fahy and himself, in upholding the action of the Commission stated: "Although considerations such as those suggested by petitioners may well be part of the complex out of which the Commission's judgment as to `public convenience and necessity' arises, they are nowhere made standards governing the issuance or denial of certificates."[35]
 
 
 28
 In Charleston & W. C. Ry. v. FPC, 1956, 98 U.S.App.D.C. 241, 234 F.2d 62, Southern Natural Gas Company had been granted a certificate of public convenience and necessity. The coal and railroad interests petitioned for a vacating order. Two commissioners had dissented from the order below on conservation grounds. The court in affirming the Commission's order stated: "Had the decision initially been for us we might have reached a different conclusion, on the ground of the dissent or on other grounds. But the judgment of the Commission was within its legal competence."[36]
 
 
 29
 It is apparent that none of these three cases is helpful here. Each dealt with a situation where a certificate had been granted by the Commission; the court's only concern in each was whether the Commission had failed to consider a matter of controlling significance. To say that considerations of conservation are not controlling does not aid in deciding whether or not such matters may be considered at all. In none of these cases is there any indication of a search of the legislative history to determine whether the Commission had the authority to employ such considerations in dealing with applications for certificates; obviously there was no need to make such a search. Finally, it should be mentioned that, in all three cases, the pipe line company involved was both selling and transporting the gas. That is not true here.
 
 
 30
 Nor does the Supreme Court decision in FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, shed any more light on the matter. Although in that case, a rate-making proceeding, the State of West Virginia argued that the Commission should have considered, among other things, the effect of its rate order on conservation of West Virginia's natural gas supplies, Mr. Justice Douglas, speaking for the majority, stated: "We have searched the legislative history of the Natural Gas Act for any indication that Congress entrusted to the Commission the various considerations which West Virginia has advanced here. And our conclusion is that Congress did not."[37] On the other hand, he did go on to say that "when it comes to cases of abandonment or of extensions of facilities or service, we may assume that, apart from the express exemptions contained in § 7, considerations of conservation are material to the issuance of certificates of public convenience and necessity. But the Commission was not asked here for a certificate of public convenience and necessity under § 7 for any proposed construction or extension."[38] Thus this rate case has been used as authority by both sides in the present proceedings. It may be granted that the dissenting opinion of Mr. Justice Jackson goes far in stating reasons of public policy for a strong conservation program by way of husbanding our natural gas resources. But that does not put anything new into the statute.
 
 
 31
 The Commission, during the fifties, has recommended to Congress that it be given increased authority in allocation of natural gas supplies. From 1951 through 1953, the Commission requested that the Act be amended "to provide specifically for control by the Commission of the end-use of natural gas when required for national defense or to safeguard the available supply."[39] In 1954 and later years that request was tempered somewhat to a request "to provide specifically for control by the Commission of the allocation of natural gas when required for national defense or to safeguard the available supply in emergency situations."[40] So far these recommendations have not been adopted. Whether they should be, or whether they should not be, and what the arguments are for each position has no bearing on our job in these cases. What we are sure of is that interstitial administrative action cannot be substituted for asked-for legislation if that legislation is not forthcoming.
 
 
 32
 Some of the argument made on behalf of Transco goes pretty far and it is worth taking the space to point out that we are not agreeing with it. It is said that the Commission can only go on what is in the record before it. That statement is too broad. Fact conclusions, of course, must be supported by testimony, but considerations of policy are open to commissions as well as to courts. A commission may call upon its administrative experience just as a court calls upon its judicial experience. But each, it may be added, must stay within the limits of its authority.
 
 
 33
 Let us now turn to the reasons given by the Commission for its denial of this certificate.
 
 
 34
 The first one was to the effect that if the requested certificate was granted the Commission would be confronted with many requests of the same general character; if this particular one was approved it would have no "fair or rational basis for denying similar such requests."
 
 
 35
 This reason is not open to the criticism that there were no facts to prove it. It is open to the criticism, however, that it is a denial of the discriminatory process which any judicial body must exercise. If the Commission has authority to act on a matter at all, it must, just as a court must, make its choice and pick out what it deems the most important determinative factors. Reason one, therefore, we think a denial of the very thing that a Commission acting semi-judicially must do.
 
 
 36
 The second reason given is that the authorization of this and similar proposals "would pre-empt for this usage capacity which would otherwise be available to meet more urgent and widely beneficial public needs * * *." If this is not a frank expression of an assertion of authority for general conservation, we do not see how one could be expressed. We do not see any significant change in the opinion on denial of rehearing, quoted earlier. If what is said above in this opinion is correct, this reason is obviously a bad reason.
 
 
 37
 Transco makes another point in connection with this ground which we think has substance to it. The Commission talks of preemption of facilities. Transco says the Commission should have had evidence on preemption of facilities before it made such a statement. Transco argued orally to the Court that its own depreciation situation is such that it must keep on expanding facilities. Business-wise and depreciation-wise, it says, it is to its advantage to do so and for the Commission to talk about "preemption" without giving Transco a chance to demonstrate the truth of its argument is not fair administrative procedure.
 
 
 38
 Reason three is likewise an implicit assertion of the authority to conserve and allocate natural gas resources. The Commission points out that the impact of large demand on limited supply of gas is certain to raise rates even if only one bidder is bringing demand to bear on the supply. If more bidders come into the field the tendency will be increased to raise prices. In other words, the Commission wishes to discourage such bids as Con Edison made and is going to discourage them by not giving a certificate to get the gas out of the field where it has been purchased. Here again is an implicit assertion of authority to conserve and allocate supplies.
 
 
 39
 The fourth factor or policy consideration is a bit different. This points out that while Con Edison can compete with pipe lines for gas purchases, small purchasers will not be so fortunate. And then it expresses the possibility that a pipe line may not be able or willing to continue to buy in competition with individual large purchasers. In other words, only pipe lines should purchase gas for only they engage in interstate transportation and thereby come under authority of the Commission. This puts a consideration into the statute which the Congress did not envisage. See § 1 (b) of the Act.
 
 
 40
 Ending up, the Commission says that these factors would weigh against the grant even if the "gas were to be used for a demonstrably superior use." It then says, in effect, that the purpose for which these sales would be made is something less than desirable.
 
 
 41
 There was plenty of evidence in these cases from the City of New York and Con Edison that Con Edison was confronted with a very difficult problem. There was testimony that the fly ash discharge from the boilers in question at this Waterside plant was 15,000 pounds a day and the sulfur dioxide discharge 42,000 pounds daily. There was testimony that the substitution of gas to fire these two boilers in this populous section of the City would eliminate both the sulfur dioxide and the fly ash. To us it does not seem important that elimination of the smoke from these two boilers would not solve all the air pollution problems of the City of New York. There was reliable testimony that the situation would be helped, especially in the area of the United Nations Building and Tudor City.
 
 
 42
 Of course the weighing of factors of this kind, if within the jurisdiction of a body, is a matter in which a reviewing tribunal will not interfere if a rational conclusion has been reached.
 
 
 43
 More serious, however, is the assumption which the Commission makes that the proposed use was "inferior." It is true that the gas, under the agreement, was not to be sold and it was established that it was to be used to fire boilers. But these boilers, according to the evidence, generate power for electricity and make steam for heating. We do not see that using gas to make steam to heat an apartment house is inferior to the use of gas to heat a single family residence whether by steam, hot water or whatnot. The cases the Commission had here were not those of the use of gas for industrial purposes only. There was involved also the use of gas in a step for space heating and lighting. That factor was completely ignored by the Commission so far as its opinion reveals.
 
 
 44
 The conclusion of the Court is that this order must be set aside and the cases returned to the Commission with directions to issue the certificate applied for, subject to further hearing on the minor question of rates described in footnote (2).
 
 
 
 Notes:
 
 
 [1]
 21 F.P.C. at 141
 
 
 [2]
 The Commission noted in its order that a minor portion of the rate structure, dealing with the rate for the transportation of the "displaced" gas had not, in its opinion, been substantiated on the record. 21 F.P.C. at 141 n. 3. The petitioners dispute this finding. However, all concerned agree "that the Commission did not rely upon that deficiency as a ground for denying the certificate. Had the Commission otherwise been able to grant the certificate, it would presumably have remedied the defect by a condition." Brief for the FPC, p. 5, n. 10
 
 
 [3]
 In its Order Denying Application for Rehearing, the Commission stated that "of course there can be no preemption of capacity not already built; but the construction and utilization of given capacity for service of the character proposed here would reasonably lessen the likelihood of capacity being constructed for other and future service of a character more in accordance with the requirements of public convenience and necessity." 21 F.P.C. at 402
 
 
 [4]
 21 F.P.C. at 141
 
 
 [5]
 15 U.S.C.A. §§ 717-717w
 
 
 [6]
 Transcontinental Gas Pipe Line Corp., 20 F.P.C. 303, 316 (1958)
 
 
 [7]
 "No natural-gas company * * * shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations. * * *" 15 U.S.C.A. § 717 f(c)
 "Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." 15 U.S.C.A. § 717f(e).
 
 
 [8]
 Brief for the FPC, p. 40
 
 
 [9]
 "As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest." 15 U.S. C.A. § 717(a)
 
 
 [10]
 "The present transportation of natural gas in the large pipeline systems is intimately concerned with the sale of large or major portions of the gas so transported to industries of the general type outlined above. [This refers to use of gas for electric power plants, firing of large boilers and furnaces, brick kilns, steel mills, etc.] The gas industry claims that the supply to general consumers at prevailing prices is only made possible by the quantity sales to industry in direct competition with coal and oil. Whether such a situation is essential to maintain service at moderate prices is one problem, but it does not eliminate the fact that every thousand feet used to replace coal in large operations has diminished the future supply of natural gas available for the householder and other retail consumers, which may be considered the highest grade of service to which natural gas may be put." Federal Trade Commission, Final Report to the Senate of the United States, S.Doc. No. 92, Part 84-A, 70th Cong., 1st Sess. 125 (1936)
 
 
 [11]
 Id. at 581-606
 
 
 [12]
 Id. at 607-617
 
 
 [13]
 "1. Conservation is the first problem that demands attention. Vast acreage is being drained and natural gas is being subjected to profligate and wanton waste and uneconomical uses. This has been estimated to amount to as much as a billion and a quarter cubic feet per day in one field. Witnesses having expert knowledge testified that this amount ofdaily waste is sufficient to supply the entire present needs of the domestic and commercial users of natural gas in the United States." Id. at 608 (emphasis supplied). This is clearly referring to the waste type problems discussed earlier in the report. Id. at 92-101.
 
 
 [14]
 Id. at 615-616 (emphasis supplied)
 
 
 [15]
 Id. at 612
 
 
 [16]
 Id. at 613 (emphasis supplied)
 
 
 [17]
 Ibid
 
 
 [18]
 "(a) In case two or more States propose to the Congress compacts dealing with the conservation, production, transportation, or distribution of natural gas it shall be the duty of the Commission to assemble pertinent information relative to the matters covered in any such proposed compact, to make public and to report to the Congress information so obtained, together with such recommendations for further legislation as may appear to be appropriate or necessary to carry out the purposes of such proposed compact and to aid in the conservation of natural-gas resources within the United States and in the orderly, equitable, and economic production, transportation, and distribution of natural gas
 "(b) It shall be the duty of the Commission to assemble and keep current pertinent information relative to the effect and operation of any compact between two or more States heretofore or hereafter approved by the Congress, to make such information public, and to report to the Congress, from time to time, the information so obtained, together with such recommendations as may appear to be appropriate or necessary to promote the purposes of such compact.
 "(c) In carrying out the purposes of this chapter, the Commission shall, so far as practicable, avail itself of the services, records, reports, and information of the executive departments and other agencies of the Government, and the President may, from time to time, direct that such services and facilities be made available to the Commission." 15 U.S.C.A. § 717j.
 
 
 [19]
 81 Cong.Rec. 6726 (1937)
 
 
 [20]
 A proposal "to tap the Southwestern reserves of natural gas to supply the tremendous markets available in the Northeastern States poses the country with a serious problem of energy resource conservation. The Natural Gas Act as presently drafted does not enable the Commission to treat fully the serious implications of such a problem. The question should be raised as to whether the proposed use of natural gas would not result in displacing a less valuable fuel and create hardships in the industry already supplying the market, while at the same time rapidly depleting the country's natural gas resources
 "Careful study of the entire problem may lead to the conclusion that use of natural gas should be restricted by functions rather than by areas. * * * General use of natural gas under boilers for the production of steam is * * * under most circumstances of very questionable social economy.
 * * * * *
 "The Commission is convinced that these conservation problems are of such preeminent importance, especially in the present world situation, that the Natural Gas Act should be immediately broadened to give the Commission adequate power to resolve them in the public interest." 20 FPC Ann.Rep. 79-80 (1940).
 
 
 [21]
 56 Stat. 83-84 (1942)
 
 
 [22]
 Hearings on H.R. 5249 Before the House Committee on Interstate and Foreign Commerce, 77th Cong., 1st Sess. (1941)
 
 
 [23]
 H.R.Rep. No. 1290, 77th Cong., 1st Sess. (1941); S.Rep. No. 948, 77th Cong., 2d Sess. (1942)
 
 
 [24]
 "The Commission is keenly aware of the importance of conservation and the serious problems raised by the continued construction of large natural-gas pipe lines and the accelerated depletion of our natural-gas reserves due to war activities. In its annual report to Congress for the year 1940 the Commission discussed this question at some length. In that report a number of important questions were raised, but it would appear that further studies and investigations must be conducted before satisfactory answers to these important and difficult questions can be formulated
 "In its hearings on certificate cases, under section 7(c) of the act, as amended, the Commission has freely permitted the intervention of representatives of coal, railroad, labor, and other interests concerned with the production or transportation of competing fuels. These interests have presented extensive evidence on the economic, sociological, and technological aspects of fuel competition, and their representatives have strongly urged the Commission either to deny certificates on the general grounds of conservation or to attach restrictions which would severely limit the uses for which natural gas might be sold.
 "It has been the unanimous view of the Commission that, inasmuch as the Congress had not given it comprehensive powers to deal with the end uses for which natural gas is consumed, and had granted the Commission no authority to regulate rates for the direct sales of natural gas to industry, it was the duty of the Commission not to seek to exercise such authority until the Congress amended the Natural Gas Act to confer on the Commission such specific powers as Congress desired it to exercise." Federal Power Commission, The First Five Years Under the Natural Gas Act 15 (1944). The Commission itself thought these paragraphs important enough to quote in full in its own five-page press release on the report. See FPC Release No. 2342, January 23, 1944.
 
 
 [25]
 FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333
 
 
 [26]
 Memphis Natural Gas Co., 4 F.P.C. 197 (1944), aff'd sub nom., Department of Conservation v. FPC, 5 Cir., 148 F.2d 746, certiorari denied, 1945, 326 U.S. 717, 66 S.Ct. 22, 90 L.Ed. 424. The Commission also pointed out in its opinion that the application involved extension of facilities adequately to supply present customers rather than to supply new customers
 
 
 [27]
 Northern Natural Gas Co., 4 F.P.C. 1099 (1945), 7 F.P.C. 296 (1948) (use as boiler fuel by a power company); East Tennessee Natural Gas Co., 8 F.P.C. 836 (1949), aff'd sub nom., National Coal Ass'n v. FPC, 1951, 89 U.S.App.D.C. 135, 191 F.2d 462 (use as boiler fuel by Atomic Energy Commission); Piedmont Natural Gas Corp., 9 F.P.C. 629, 70, 83-90 (1950) (use as boiler fuel by a power company); Texas Gas Transmission Corp., 10 F.P.C. 391 (1951) (use as boiler fuel by Tennessee Valley Authority and by a power company); Transcontinental Gas Pipe Line Corp., 11 F.P.C. 605, 615 (1952) (use as boiler fuel by a power company); Texas Gas Transmission Corp., 12 F.P.C. 658 (1953) (use as boiler fuel by a power company); Mississippi River Fuel Corp., 12 F.P.C. 109, 114 (1953) (use as boiler fuel by a power company); Panhandle Eastern Pipe Line Co., F.P.C. Opinion No. 274 (1954), aff'd on other grounds sub nom., Panhandle Eastern Pipe Line Co. v. FPC, 3 Cir., 232 F.2d 467, certiorari denied, 1956, 352 U.S. 891, 77 S.Ct. 129, 1 L. Ed.2d 86 (use as boiler fuel by a paper company and three others); Southern Natural Gas Co., 14 F.P.C. 243 (1955), aff'd sub nom., Charleston & W. C. Ry. v. FPC, 1956, 98 U.S.App.D.C. 241, 234 F.2d 62 (use as boiler fuel by power company serving three customers one of which devotes all power obtained to an Atomic Energy Commission project); Northern Natural Gas Co., 15 F.P.C. 682, rev'd 15 F.P.C. 1634 (1956), aff'd sub nom., National Coal Ass'n v. FPC, 1957, 101 U.S.App.D.C. 95, 247 F.2d 86 (use as boiler fuel by a power company); Houston Texas Gas & Oil Corp., 16 F.P.C. 118 (1956) (use as a boiler fuel by two Florida power companies); Cities Service Gas Co., 17 F.P.C. 516 (1957) (use as boiler fuel by a power company)
 
 
 [28]
 Northern Natural Gas Co., 4 F.P.C. 1099 (1945), 7 F.P.C. 296 (1948)
 
 
 [29]
 Piedmont Natural Gas Corp., 9 F.P.C. 629, 70, 83-90 (1950). See Transcontinental Gas Pipe Line Corp., 11 F.P.C. 605, 615 (1952)
 
 
 [30]
 Texas Gas Transmission Corp., 10 F.P.C. 391 (1951) (Mississippi Power & Light Co. and Tennessee Valley Authority)
 
 
 [31]
 Texas Gas Transmission Corp., 12 F.P.C. 658 (1953) (Mississippi Power & Light Co.)
 
 
 [32]
 Panhandle Eastern Pipe Line Co., F.P.C. Opinion No. 274 (1954), aff'd on other grounds, sub nom., Panhandle Eastern Pipe Line Co. v. FPC, 3 Cir., 232 F.2d 467, certiorari denied 1956, 352 U.S. 891, 77 S.Ct. 129, 1 L.Ed.2d 86. Certificates were granted for service to three industrial companies and were denied for service to a fourth, a paper company. The latter had complained about fly ash trouble but the Commission concluded that the evidence therein indicated that the problem could be abated without resort to natural gas as boiler fuel
 
 
 [33]
 We do not think that any of these cases are sufficiently significant to require detailed analysis. If the Commission has authority to regulate end use as part of a conservation plan it certainly has the authority to balance the factors in each individual case as it arises
 
 
 [34]
 148 F.2d at pages 749-750 (emphasis supplied)
 
 
 [35]
 191 F.2d at page 467 (emphasis supplied)
 
 
 [36]
 234 F.2d at page 64
 
 
 [37]
 320 U.S. at page 609, 64 S.Ct. at page 291
 
 
 [38]
 320 U.S. at page 612, 64 S.Ct. at page 292, (emphasis supplied)
 
 
 [39]
 31 FPC Ann.Rep. 145 (1951); 32 FPC Ann.Rep. 152 (1952); 33 FPC Ann. Rep. 154 (1953)
 
 
 [40]
 34 FPC Ann.Rep. 170 (1954); 35 FPC Ann.Rep. 182 (1955); 36 FPC Ann.Rep. 18 (1956); 37 FPC Ann.Rep. 24 (1957); 38 FPC Ann.Rep. 16 (1958)