**PANHANDLE EASTERN PIPE LINE COMPANY, Petitioner,**
v.
**FEDERAL POWER COMMISSION, Respondent.**
No. 11510.

United States Court of Appeals Third Circuit.
Argued Oct. 20, 1955.
Decided April 27, 1956.

Rehearing Denied June 5, 1956.

G. R. Redding, Indianapolis, Ind. (Steptoe & Johnson, Washington, D. C., Baker & Daniels, Indianapolis, Ind., on the brief), for petitioner Panhandle Eastern Pipe Line Co.

Charles V. Shannon, Washington, D. C. (John Dern, Arthur R. Seder, Jr., Sidley, Austin, Burgess & Smith, Chicago, Ill., Donald R. Richberg, Washington, D. C., Oscar L. Chapman, Washington, D. C., on the brief), for intervenor Michigan Consolidated Gas Co.

Robert L. Russell, Washington, D. C. (Willard W. Gatchell, Gen. Counsel, Lambert McAllister, Asst. Gen. Counsel, Louis Flax, Washington, D. C., on the brief), for respondent Federal Power Commission.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Petitioner seeks to have set aside two related orders of the Federal Power Commission dated July 15, 1954 and July 28, 1954 together with the Commission's Opinion No. 274 which accompanied the July 28th order. Though nine dockets are involved, all of the proceedings were consolidated by the January 15, 1955 order of the Commission under Docket No. G–2301.

Panhandle is a natural-gas company within the meaning of the Natural Gas Act, Section 2(6), 15 U.S.C.A. § 717a (6), as amended. On May 4, 1950 the Commission issued a certificate of convenience and necessity which allowed Panhandle to increase its capacity from 500,000 Mcf per day to 800,000 Mcf per day. Later, following hearings, by its Opinion Nos. 214 and 214–A, 10 F.P.C. 185 and 322 (1951) the Commission fixed the form of tariff to be filed by Panhandle for its gas. In accordance with this Panhandle filed its tariff on August 17 and 30, 1951. The Commission order of March 5, 1952 designated the effective date of this as February 20, 1952. Against the opposition of Panhandle, the Commission included in the tariff three interruptible rate schedules, I–1, I–2 and I–3. Section 7 of these details a procedure for offering and curtailing gas under the schedules as follows:

"Whenever Seller has gas available for sale in excess of that necessary to meet its firm and annual contract volume service requirements, it shall first offer such gas to its Buyers, which own or control storage facilities to the extent such Buyers contract to take such gas for storage, and shall then offer any remaining gas on an equitable basis to its other customers. The Service Agreement shall specify the maximum daily volume for such interruptible service. Service hereunder may be interrupted at any time and in any amount by Seller in a nondiscriminatory manner in its sole discretion after reasonable notice to Buyer and to direct customers. On any day for which Seller has ordered curtailment of service, in whole, or in part under this rate schedule, all gas taken by Buyer in excess of the curtailment shall be

considered as delivered under Seller's applicable firm rate schedule."

Section 1.4 of the tariff's general terms and conditions defines "Buyer" as, "Buyer shall mean a purchaser of natural gas from Seller under a Service Agreement."

Panhandle made no attempt to obtain a rehearing from the Commission on its tariff or to review the action of the Commission. However, it has made no sales under its filed interruptible rate schedules and has refused to make such sales. In fact, it tried to dispose of its interruptible gas to new direct industrial customers, by establishing preferential classifications of service for such customers of higher priorities than the classifications available for resale customers under the tariff.

The first three of the dockets, Nos. G–2035, G–2049 and G–2050, have to do with three new direct customers of Panhandle, Mrs. Tuckers Foods, Inc., DeKalb Agricultural Assn., Inc. and Monroe Paper Products Co. Panhandle contracted with these industries to furnish them portions of its interruptible gas. In connection with this it applied to the Commission for disclaimers of jurisdiction or certificates of public convenience and necessity. There was a fourth application of the same kind, Docket No. G–2040, for service of gas to Bohn Aluminum & Brass Company, which company was succeeded by Bridgeport Brass Company. Later Panhandle withdrew its request in this docket for disclaimer of jurisdiction. The Fifth Docket, No. G–2048, concerns petitioner's application for a certificate covering a new loop to its pipe line serving the area in the vicinity of the Bohn plant. This was designed for both Bohn and the local utility, Citizens Gas Fuel Company, a Panhandle resale customer. The Commission granted temporary authority in Docket Nos. G–2040 and G–2048 for construction and operation of the loop and to furnish up to 2,000 Mcf per day to Bohn, deliveries to be made subject to interruption and the authority subject to revision after hearing.

Docket No. G–2091 involves investigation by the Commission of direct sale of gas by petitioner to Mueller Brass Company without having first obtained appropriate certificate authorization and of other related matters. In Docket No. G–2301, the Commission on November 5, 1953 ordered Panhandle to show cause why it should not be required to sell interruptible gas to the franchise distributors in the various localities of the above mentioned industries whom Panhandle either intended to or was supplying gas direct. Thereafter Panhandle, on December 15 and 28, 1953, filed revised tariff sheets purporting to cancel its interruptible rate schedules and revising connected tariff provisions. The Commission suspended these by its order of January 15, 1954, establishing Docket No. G–2349 for this cancellation proceeding. All of the dockets mentioned were consolidated for hearing. Included was the ninth Docket, No. G–2073. That concerned problems not urged as points of controversy here. Panhandle filed a motion to make its revised tariff effective. Argument was had on June 25, 1954.

On July 15, 1954, the Commission denied Panhandle's motion and on July 28, 1954 issued its Opinion No. 274 and accompanying order whereby it disallowed cancellation of petitioner's interruptible rate schedules as filed August 17 and 30, 1951; it modified and interpreted those schedules; it denied disclaimers of jurisdiction; it issued and denied certificates of public convenience and necessity and required the sale and delivery of natural gas for resale. Panhandle applied to set aside the July 15th order or for a rehearing. It also sought rehearing and stay of the order of July 28th. These were denied by the Commission on November 9, 1954 by an order which modified and affirmed Opinion No. 274 and the accompanying order.

Panhandle contends that the order of July 28, 1954 is invalid as a clear attempt to regulate direct sales. It argues at length that regulation of direct sales by the Commission is con--

trary to the Act. Actually, there is no dispute as to this. The Commission has not in the present proceedings asserted jurisdiction over direct sales of natural gas. It recognizes that Section 1(b) of the Act eliminates its jurisdiction in that respect.[1] And see Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 1951, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993; Federal Power Commission v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499; Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 1947, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 and City of Hastings, Nebraska v. Federal Power Commission, 1954, 95 U.S.App.D.C. 158, 221 F.2d 31, certiorari denied 1955, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1252. Nor is the Commission seeking to require Panhandle to make its rate schedule applicable to direct sales and thus to regulate those sales as in Colorado Interstate Gas Co. v. Federal Power Commission, 3 Cir., 1950, 185 F.2d 357.

What the Commission does say, and rightly we think, is that in considering the question of issuing a certificate of public convenience and necessity for the construction or operation of facilities for the transportation of natural gas to a new customer either direct or resale it, as part of the express certificate authority given it by Section 7(c) of the Act, 15 U.S.C.A. § 717f(c), over the transportation of natural gas, is, among other things, fundamentally concerned with the effect the issuance of the certificate would have on the applicant pipe line's present service to its existing customers. This control over gas transportation by the Commission is completely independent of the sale of the gas and just as important. It is a separate subject of regulation irrespective of whether the particular gas is thereafter sold for resale or direct to consumers. Federal Power Commission v. East Ohio Gas Co., 1950, 338 U.S. 464, 468, 70 S.Ct. 266, 94 L.Ed. 268.

In both direct and resale transactions the gas must be transported and whatever the nature of the sale might be, it could affect the entire operation of the pipe line and its customers. The Commission's authority under the Act to issue transportation certificates where there were to be direct sales has never been questioned in court until now. Since 1943 it has passed on a hundred or more applications on the part of petitioner and other pipe line operators in the natural gas industry for permission to increase capacity for direct sales. This interpretation of its authority by the Commission through the years must be given considerable weight. Boehm v. Commissioner, 1945, 326 U.S. 287, 292, 66 S.Ct. 120, 90 L.Ed. 78; United States v. American Trucking Associations, Inc., 1940, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; Helvering v. Winmill, 1938, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52; United States v. Shreveport Grain & Elevator Co., 1932, 287 U.S. 77, 84, 53 S.Ct. 42, 77 L.Ed. 175. And where, with the Commission's position of record, Congress amended the Act, as it did, without changing that part of it so construed[2] implied approval of that interpretation is strongly evidenced. Helvering v. R. J. Reynolds Tobacco Co., 1939, 306 U.S. 110, 115, 59 S.Ct. 423, 83 L.Ed. 536; United States v. Dakota-Montana Oil Co., 1933, 288 U.S. 459, 466, 53 S.

1. Section 1(b) of the Act reads as follows: "The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." 15 U.S.C.A. § 717(b).

2. The Act was amended in 1954 by adding 1(c) thereto and back in 1947 there was an amendment to Section 7. Neither one of these restricted the above referred to interpretation of its authority by the Commission.

Ct. 435, 77 L.Ed. 893. The sound principle behind the exercise of that control is reasonable safeguarding of a pipe line's customers. If acceptance by a pipe line of a large new direct consumer would seriously decrease and otherwise interfere with its existing service the Commission has had no hesitancy in refusing a certificate, especially, as the Commission said in City of Detroit v. Panhandle Eastern Pipe Line Company, 1946, 5 F.P.C. 43, 50, "[t]o the extent necessary to enable the Commission to protect the adequacy of service to its customers". Not only is this a sensible construction of the Commission's certificate jurisdiction under Section 7(c) but to hold otherwise would be to render the whole purpose of fair regulation in the public interest, the plenary reason for the Commission's existence, futile.[3]

The Commission, back in its 1946 report to the Congress, presented its position accurately when it said: "While the Commission does not have jurisdiction over direct sales to an industrial consumer as such, it does have the duty of protecting the public interest by preventing a natural gas company from using facilities subject to the Commission's jurisdiction for a purpose impairing ability to provide adequate and reasonable natural gas service to existing customers." And we find nothing in any of the situations before us justifying the conclusion that the Commission is endeavoring to extend its transportation authority to embrace control of direct sales. It has the right to issue a certificate allowing transportation of gas only when public convenience and necessity requires it. If the granting of a certificate would result in public inconvenience and is not required by public necessity then, irrespective of the method of disposal of the gas, the Commission could not properly allow the requested permission. The gas included eventually might be for resale or direct sale but the decision of the Commission must be rendered prior to any of the particular gas flowing through the pipe. That decision goes to the operation of the line itself. When the Congress gave the Commission control over the transportation of natural gas, it necessarily gave it control over the functioning of a pipe line's facilities. Since these are limited, new services must be subject to the Commission's authority if the latter is to be at all effective. Otherwise the Commission would be unable to enforce the mandate of Section 4(b) of the Act, 15 U.S.C.A. § 717c(b), and a natural gas company, contrary to the there declared principles of the Act, would be able to "(1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service."

If the orders on review had failed to limit the priorities of interruptible service for direct sales to those available for the resale customers, Panhandle, by allowing higher priorities to its direct sale purchasers who constitute only 6% of its total volume of business, could preempt the entire interruptible capacity and leave the resale group without any of the excess gas at all. The resale buyers, saddled as they are with most of the cost of construction and maintenance of the transportation facility, are entitled to a reasonable amount of the I Schedule gas. This is the intent and accomplishment of the orders.

As to the gas allocated to petitioner for direct sale, the Commission has not fixed and has no wish to fix the rate at

---

3. Section 7(c) reads in pertinent part:

"No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations."

which it is to be sold. That is a matter for the various state regulatory bodies. Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, supra. But those tribunals in turn have no warrant to interfere in the Commission's allocations. If they had, the states would be forced to compete for the gas and petitioner would be free to sell its interruptible supply in those states offering it the greatest advantages. That is precisely the kind of situation contemplated by the Supreme Court in the Indiana case, supra, where it said at 332 U.S. 523, 68 S.Ct. 199:

"* * * the matter of interrupting service is one largely related, * * * to transportation and thus within the jurisdiction of the Federal Power Commission to control, in accommodation of any conflicting interests among various states."

■ Panhandle also argues that its motion to make the revised tariff sheets effective should have been granted. It maintains that it followed the method outlined in Section 4(d) of the Act for a natural gas company to effect changes in its rates, charges, classifications and service; that since the Commission did not enter an order disapproving the contemplated changes within the five months suspension period of Section 4(e) of the Act the revised sheets went into effect and its interruptible schedules were cancelled.

The contention is without merit and the cases cited by petitioner afford it no support. As we have already outlined, the interruptible schedules which petitioner sought to cancel by filing revised tariff sheets were filed by Panhandle because the Commission so ordered after a hearing at which the company had opposed them. Panhandle did not request rehearing or seek review of that order. It did seek and was allowed permission to construct and operate new pipe line facilities for an increased amount of gas. Conditioned to this allowance the Commission forced it to file a prescribed form of tariff which contained the interruptible schedules.[4] After the order had become final it could not be collaterally nullified through the filing of a rate schedule change. Section 4(d) of the Act is of no help to petitioner in its endeavor to so unilaterally destroy the order which had been arrived at after an adversary hearing and under which petitioner had been proceeding since its issuance. Federal Power Commission v. Colorado Interstate Gas Co., 1955, 348 U.S. 492, 502, 75 S.Ct. 467, 99 L.Ed. 583. What Section 4(d) provides is an alternative method of effecting changes otherwise permissible by virtue of the Act. United Gas Pipe Line Co. v. Mobile Gas Service Corporation (Federal Power Commission v. Mobile Gas Service Corp.), 1956, 350 U.S. 332, 76 S.Ct. 373.

■ Lastly, complaint is made that the Commission was unreasonable in requiring petitioner to act under the interruptible schedules. This is an attempt by petitioner to retry a factual issue, completely ignoring the basic rule that such question is for the informed judgment of the Commission. Section 19(b) of the Act, 15 U.S.C.A. § 717r(b); Colorado Interstate Gas Co. v. Federal Power Commission, 1945, 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206; Federal Trade Commission v. Algoma Lumber Co., 1934, 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655; Manufacturer's Light and Heat Co. v. Federal Power Commission, 3 Cir., 1953, 206 F.2d 404, 407; Cities Service Gas Co. v. Federal Power Commission, 10 Cir., 1946, 155 F.2d 694, 698–699, certiorari denied 329 U.S. 773, 67 S.Ct. 191, 91 L. Ed. 664.

■ The record is clear that the Commission did not act arbitrarily in refusing to allow petitioner to cancel its interruptible schedules. Though Panhandle lists several items in its state-

---

4. The statutory authority for the attachment of such conditions to a certificate is Section 7(e). See Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, 3 Cir., 1953, 203 F.2d 494, 497.

ment wherein it alleges the unreasonable attitude of the Commission it argues only one, a claim that serious hazards would result from functioning under the interruptible schedules. This is at best conjectural. There is testimony that the types of difficulties petitioner urged can be overcome. The other specifications not argued have no real substance.

We are entirely satisfied that the Commission's orders of July 15, 1954 and July 28, 1954, with its Opinion No. 274 accompanying the latter, are justified by substantial evidence. The Commission by those orders is insisting that the petitioner properly perform its obligation to its existing customers. It is refusing to allow petitioner to avoid its responsibilities in that regard by selling all of its interruptible capacity directly to industry to the detriment of its resale customers and the consuming public. The control exercised is an integral part of the Commission's jurisdiction over the transportation of natural gas.[5]

The orders will be affirmed.

5. Docket No. G–2048 covering the construction of the loop to petitioner's pipe line in the Bridgeport Brass Company plant area has the same ultimate problem

---

as appears in the other dockets before us. That certificate of convenience and necessity was expressly conditioned upon (1) no further payments being made by Bridgeport or Citizens Gas Fuel Company for the construction of the loop and (2) accounting for their past payments on petitioner's books as a contribution in aid of construction. Petitioner's agreement with Bridgeport and Citizens is that those companies reimburse it for the construction cost through additional charges on the gas delivered them. The temporary certificate was merely permissive, it did not force petitioner to construct the loop. The construction itself was subject to final action by the Commission.

The additional charges by petitioner to Bridgeport and Citizens are discriminatory and in violation of the Act. Section 154.21 of the Commission Rules, 18 C.F.R. 154.21. Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 1951, 341 U.S. 246, 71 S.Ct. 692, 95 L. Ed. 912; McClellan v. Montana-Dakota Utilities Co., D.C.Minn.1952, 104 F.Supp. 46; Mondakota Gas Co. v. Montana-Dakota Utilities Co., D.C.Mont.1951, 103 F. Supp. 666. In its Opinion No. 274 the Commission makes it plain that the cost of the loop as a whole will be accounted for in Panhandle's rate base and given consideration in the normal depreciation process instead of it being borne exclusively by the two customers, Citizens and Bridgeport.