**MISSOURI EDISON COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Panhandle Eastern Pipe Line Co.,
Intervenor.

No. 72–1406.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 8, 1972.

Decided March 20, 1973.

Morton L. Simons, Washington, D. C.,
for petitioner.

George W. McHenry, Jr., First Asst.
Sol., F. P. C., with whom Leo E. For-
quer, Acting Gen. Counsel, F. P. C., was
on the brief for respondent. Gordon
Gooch, Gen. Counsel, F. P. C., also en-
tered an appearance for respondent.

James J. Flood, Jr., Washington, D.
C., with whom Raymond N. Shibley,
Washington, D. C., was on the brief for
intervenor.

Before Mr. Justice CLARK,* Asso-
ciate Justice of the Supreme Court of
the United States, and MacKINNON
and ROBB, Circuit Judges.

Mr. Justice CLARK:

This is another of a series of cases be-
ginning a score of years ago and con-
tinuing through 1969, in which Panhan-
dle Eastern Pipe Line Company, a major
interstate pipeline system, has opposed
the effectuation of the long-established
policy of the Federal Power Commission
"to favor service to industrial customers
by local distributors." Panhandle East-
ern Pipe Line Co., Op. 274, 13 FPC 301,
aff'd, Panhandle Eastern Pipe Line Co.
v. FPC, 232 F.2d 467 (3 Cir. 1956), cert.
den., 352 U.S. 891, 77 S.Ct. 129, 1 L.Ed.
2d 86; Panhandle Eastern Pipe Line
Co., Op. 510, 36 FPC 1107, reh. den., Op.
510–A, 37 FPC 314, aff'd, Panhandle
Pipe Line Co. v. FPC, 386 F.2d 607 (3
Cir. 1967); Panhandle Eastern Pipe
Line Co., Op. 539, 39 FPC 581 (1968),

* Sitting by designation pursuant to 28 U.S.C. § 294(a).

reh. den., 39 FPC 1100; Panhandle Eastern Pipe Line Co., Op. 566, 42 FPC 621 (1969).

Here, Missouri Edison Company (Mo Ed), which operates under the jurisdiction of the Missouri Public Service Commission, serves some 22 communities in northeastern Missouri and has its headquarters in Louisiana, Missouri, a town of 4500 people. It requested an order of the Federal Power Commission directing Panhandle to sell and deliver to it 15,000 mcf of gas daily for resale to Hercules, Inc. at its chemical works also located at the City of Louisiana and within Mo Ed's service community. Hercules has been furnished gas direct from Panhandle's pipeline since 1942 under contracts, the last of which expired in 1969, after which Panhandle continued service by agreement on a month to month basis. The service is by direct attachment to Panhandle's pipeline and is, therefore, not regulated by either federal or state authority. In 1969, the year the last Panhandle contract expired, Hercules' chemical works at Louisiana suffered a million dollar operating loss. In an effort to continue the plant in operation, it requested Panhandle to reduce its gas rate, but to no avail. Hercules then turned to Mo Ed and subsequently reached an agreement to acquire gas from that company at a three percent resale charge above cost. Mo Ed was also a customer of Panhandle, buying its requirements exclusively from the latter under a contract requiring a maximum of 12,500 Mcf of gas to be delivered daily on demand of Mo Ed. Panhandle delivered slightly over 1 million mcf under this contract in 1969, and the resale of this gas contributed some 12 percent to Mo Ed's total revenues. Originally Mo Ed's application with the Commission

was made under Panhandle's G–2 demand rate schedule [1] which provided for delivery on a firm basis. However, on suggestion of the Commission's staff, the application was amended to provide for delivery on an interruptible basis under Panhandle's I–2 interruptible rate schedule,[2] the identical rate schedule under which Hercules was then receiving gas from Panhandle. Both the Commission's staff and the Examiner approved the conversion of the sale from a direct pipeline one to an indirect distributor delivery, in keeping with prior Commission decisions. However, the Commission has overturned these recommendations and denied the application. We reverse.

### 1. The Findings of the Commission

In its original opinion the Commission first stated a conviction that it "should not adhere with uncompromising rigidity to a policy of preferred shifting of interruptible loads from a pipeline to a distributor." Appendix Vol. I, p. 124. As to the effect of the conversion on Panhandle's ability to serve its other customers, the Commission concurred in the Examiner's finding that there was no impairment. But other economic factors compelled a different result, it said, from that of the Examiner: It was the business of the pipeline to meet the requirements of its customers; however, the customers' demands were highly uneven, reflecting seasonal requirements; to avoid waste and added cost associated with partially filled transmission lines the pipeline sells interruptible service or installs storage capacity for gas. The contribution of an interruptible load to the pipeline's balancing program, however, is smaller when that load is "attached" by the customer rather than directly by the pipeline. Thus, "flexibility

---

1. G–2 rate schedule gas is a definite, firm amount of gas that the pipeline agrees to deliver on demand during a certain period on an uninterruptible basis.

2. I–2 rate schedule gas is surplus gas not under firm contract that the pipeline prorates among its customers after delivery

of all of its commitments under firm (G–2) gas contracts. It is interruptible by the pipeline whenever it needs the gas to meet the other contracts. Hence the I–2 is not a definite, firm delivery but is interruptible, depending upon the amount delivered under the firm contracts.

and related improved efficiency of the pipeline is diminished whenever a segment of interruptible service is transferred from direct pipelines attachment to indirect attachment through a distributor." Id. at 125–126. In Mo Ed's case the transfer of the Hercules account from Panhandle to Mo Ed would diminish the benefits which the interruptible character of the Hercules sale contributes to the load balancing operations of the Panhandle system since one-third of the annual volumes that Mo Ed proposes to deliver to Hercules would come under Panhandle's firm service rate schedule (G–2). The transfer would only create additional pressure on the Panhandle system. The Commission also noted that under conditions of gas supply shortage, gas storage should be substituted for interruptible deliveries. It would be unwise to encourage the direct attachment interruptible gas customers to migrate to distributors since this would frustrate pipeline curtailment plans, increase industrial usage, and undermine the flexibility of the pipeline during period of gas supply shortage.

2. *The Rehearing Application and Its Denial:*

On rehearing Mo Ed pointed out that it sought a supply of gas under Panhandle's I–2 rate schedule to serve Hercules on an interruptible basis; its proposal was intended merely to supplant the current non-jurisdictional, direct attachment service of Panhandle. No change in the type of service was contemplated, and the only question presented was whether Panhandle should serve Hercules by direct attachment to its pipeline or indirectly through Mo Ed. Mo Ed further noted that Panhandle's I–2 rate schedule specifically provided that "all gas sold on an interruptible basis to both direct and resale customers may be interrupted at any time and in any

amount in the sole discretion of" Panhandle. However, in order to "lay this false argument to rest," Mo Ed explicitly agreed as a condition of receiving the proposed I–2 service that Panhandle's I–2 sale to Mo Ed should be subject to the identical interruptions and curtailment by Panhandle as had been the direct sale by the latter to Hercules.

The Commission, in denying the application for rehearing, relied on its original opinion holding that Mo Ed had not discharged any element of its burden of proof. It had not shown that the transfer was necessary or desirable in the public interest and would not place an undue burden on Panhandle or cause an impairment of Panhandle's ability to render adequate service to its customers. It further found that the transfer would "firm up" a substantial portion of an interruptible industrial demand, as indicated in its original decision, by permitting Mo Ed to serve Hercules with "valley gas," [3] even when I–2 gas had been curtailed. It refused to accept Mo Ed's proffered condition on the ground that Panhandle would still have less control over deliveries to Hercules than it had under its present interruptible sale arrangement.

3. *The "Suggestion for Clarification" and the Order Granting It.*

In its request for clarification Mo Ed stated that the Commission apparently had misapprehended its proposed condition; "it was intended by the proposed condition that deliveries to Hercules would be curtailed by Panhandle exactly in the same manner and in the same amount whether those deliveries were made directly by Panhandle or indirectly through Mo Ed, that Mo Ed would agree not to use gas to which it might be entitled under Panhandle's G–2 schedule to augment deliveries to Hercules when direct industrial and I–2 deliveries were in

3. Valley gas is the amount of gas that a pipeline customer has the right to demand but does not do so because his sales are down on that particular day and he cannot sell it. The 12,500 Mcf that Mo Ed may demand daily under its present contract with Panhandle is designed to meet its peak load. When Mo Ed's customers' demands are less than peak, the difference is valley gas, and Mo Ed does not demand delivery of it unless it can find an off-peak user that wishes it.

curtailment." Appendix, Vol. I, pp. 141–142. Contrary to the Commission's decision on rehearing, the whole purpose of the conditions was to prevent Mo Ed from purchasing its full contract demand of G–2 gas and thereby augmenting deliveries to Hercules from its "valley gas" at times when Panhandle would be curtailing its direct sale customers.

The Commission then entered its third decision entitled "Order Granting Suggestion for Clarification and Re-Affirming Opinion No. 614–A". It found that "no practical method exists for controlling deliveries under both the G–2 and I–2 rate schedules so as to accomplish the objectives sought to be achieved by Mo Ed." It reasoned that before gas can be taken under the I–2 rate schedule, Mo Ed must first take all the gas it is entitled to purchase under its G–2 rate schedule. The Commission could envision no practical operating method whereby Mo Ed would know the number of cubic feet of gas its other customers would need each day under the G–2 rate schedule before gas would have to be taken under the I–2 rate schedule for delivery to Hercules. Therefore, the only way the I–2 and G–2 purchases could be handled together would be for Panhandle to bill all gas taken in excess of Mo Ed's full G–2 entitlement at the I–2 rates. The Commission concluded that the offer might be accepted if Mo Ed agreed never to purchase any "valley gas" under the G–2 rate schedule for resale to Hercules. However, the Commission observed that such an agreement would provide no benefits whatsoever to Mo Ed's other customers, thus violating the principle that industrial sales should be switched to a distributor only where such sales serve to increase load factors and reduce costs.[4] In evaluating Mo Ed's offer the Commission also took into consideration the testimony of a witness that Hercules intended to convert one of its coal-fired boilers to gas, in view of Mo Ed's reduced rate as compared with Panhandle's current one, which would increase the consumption of boiler gas.

### 4. The Conclusions of the Court

We believe that the refusal of the Commission to accept Mo Ed's offer to condition its application as stated above was error. No question was raised as to its timeliness nor was there any suggestion of prejudice flowing from the fact that it was not proposed until after the Commission's initial decision. Mo Ed had concededly proved that Panhandle's ability to service its other customers would not be impaired. Its offer to condition its sale so that it would be identical to Panhandle's current sale to Hercules cut the ground from under the other objections raised by the Commission and also proved that its proposed contract was in the public interest. At the outset we note that the present sale to Hercules by Panhandle is not under either federal or state regulation. The transfer of this sale to Mo Ed would place it under federal regulation. We believe that this is of prime importance and wholly in the public interest. In addition, we see no reason for a change in the Commission's present policy regarding the conversion of direct pipeline sales to indirect sales by distributors. As the Commission points out, this is not a mandatory policy. However, we feel that unless it will prevent the pipeline company from serving its other customers satisfactorily or it adversely affects the public interest, it should be followed. Neither of these situations justifying a departure from prior Commission policy is present here.

The Commission has found that the conversion would not adversely affect the stability of Panhandle. It is one of the larger pipelines with main transmission lines running from the Texas-Oklahoma Panhandle to Michigan and Ohio.

---

4. The Commission in its clarification decision at p. 147, Appendix Vol. I, states that the incremental net income to Mo Ed if I–2 gas alone were used to fill Her-cules' requirements would be $12,844. Mo Ed's witness testified it would be $48,-686.

In 1969 it sold some 720 million mcf and had revenues of $247,000,000. Only 55 million mcf [about 8 percent] of its sales were direct to industrial users. Most of its sales were under its G (General Service) rate schedule, with only 140,000 mcf under its I (Interruptible Service) rate schedule. The sale to Hercules is only .54 percent of Panhandle's total sales and barely 7 percent of its direct industrial sales. The record shows that in 1969 only a minimal three-tenths of one percent of the Hercules I–2 rate schedule sales of Panhandle was interrupted. Hence the distinction between the G–2 and the I–2 rate schedules in actual practice here is without much significance. As the shortage of gas increases, it may have more impact; Panhandle would be obliged to further curtail its deliveries in that event, but under our disposition its power of curtailment would not be affected by the conversion of the Hercules contract from a direct pipeline sale to an indirect distributor one.

On the other hand, by converting the sale to a direct distributor Hercules could save annually as much as $150,000, which might well be the difference between life and death to its Louisiana chemical works. If the operation were closed down, some 500 people—one-ninth of the city's population—would lose their jobs. This would not be in the public interest. In addition, the closing might cause some of the population to move away and bring about a reduction in the sale of gas and electricity with consequent loss of profits to Mo Ed. On the other hand, granting the application would be·in the public interest and would slightly increase Mo Ed's profits, though not to the point presently realized by Panhandle. The percent-

age of reduction in Panhandle's profits would be very minimal.

We, therefore, find the reasons for the Commission's refusal to accept Mo Ed's offer and approve its application to be clearly erroneous. Under Mo Ed's contract the same amount of gas will be furnished Hercules as is presently permitted under the Panhandle arrangement; it will be delivered on identical conditions and subject to the same curtailment requirements and exercise of control by Panhandle. Nor will this arrangement cause any increase in Hercules' use of gas. The amount is the same as that presently supplied under Panhandle's present contract with Hercules.[5] The Commission indicates that a witness testified that Hercules intended to switch some coal boilers to gas. But the Commission can easily prevent this by requiring Mo Ed's contract to prohibit any such increases in gas consumption. In the final analysis the Commission's only ground for refusing Mo Ed's offer is that there is no practical way of effecting Mo Ed's proposal. It is a sad commentary on our regulatory agencies that not only a business but an entire community could conceivably be destroyed for lack of agency ingenuity. We cannot believe that an appropriate order is not within the expertise of the Commission. Indeed, its recognition in the order granting Mo Ed's "clarification suggestion" of Mo Ed's proposal to "agree not to use gas to which it might be entitled under Panhandle's G–2 schedule to augment deliveries to Hercules when direct industrial and I–2 deliveries were in curtailment" (Appendix, Vol. I, P. 145) indicates its awareness of a possible solution. The Commission could give Panhandle the sole right to curtail sales to Hercules by

5. In this connection we note that the Commission subsequent to the order here has been approving applications for the additional use of gas for industrial purposes, including substituted fuel capacity and other inferior uses, many times greater than the Hercules contract. Moreover these were new contracts involving additional gas which the Commission granted on a finding that it was "unable to find that certification [of the additional volumes of industrial gas] . . . is not in the public interest." Michigan Wisconsin Pipeline Company, July 20, 1972, Docket No. CP 72–175, slip decision at p. 7, despite the fact that substituted fuel capability was present where some of the gas was to be devoted to inferior uses.

Mo Ed on the same basis that it curtails other I–2 sales simply by notice to Mo Ed. There are, we are sure, other solutions.

### 5. *Considerations on Remand.*

As we view the problem here, Mo Ed does not presently have sufficient gas under its 12,500 annual mcf contract (G–2 rate schedule) to fill its proposed contract with Hercules; if it did have sufficient gas under that contract, the application here would be routinely approved. However, Mo Ed needs additional gas to fill the contract, and it can be obtained only on an interruptible basis (I–2 rate schedule). This is what gave the Commission pause. But Mo Ed's final offer met all objections to approval, other than as to form and like technicalities.

We have decided that the Commission clearly abused its discretion in not accepting Mo Ed's offer and approving its application as amended. On remand the Commission is directed to enter an order approving the application on the conditions outlined. The Commission may approve the application by permitting Mo Ed to use its available "valley gas" in filling the Hercules contract, supplemented by sufficient I–2 rate schedule gas to meet Hercules' needs, provided Mo Ed agrees to a condition in its contract that if and when Panhandle gives notification that I–2 rate schedule gas is being curtailed, Mo Ed will accordingly curtail deliveries of both G–2 and I–2 rate schedule gas to Hercules so that at all times such deliveries will be limited to the same extent as under Panhandle's present contract with Hercules. We are not interested in how the Commission tags the gas; there is nothing sacrosanct about "valley gas"—it is but gas under any name. The crucial point is that Mo Ed's deliveries to Hercules will be on the same basis and on like conditions as are Panhandle's deliveries under its present agreement with Hercules.

The decision of the Commission is reversed and its orders are vacated. This matter is remanded for the entry of an order approving the application in accordance with this opinion and upon the conditions herein enumerated.

It is so ordered.

### ON PETITION FOR REHEARING OR CLARIFICATION

In their petitions for rehearing Respondent and Intervenor both claim error in that we stated that the direct service furnished Hercules by Panhandle was not subject to either federal or state regulation, substituted our judgment for that of the Commission on a policy matter, and remanded the case with instructions rather than allowing the Commission freedom to conduct further proceedings.

Implicit in our opinion is that the Commission, of course, has jurisdiction over the transportation of gas in interstate commerce, including the power to order curtailment of direct pipeline sales. The whole purpose of our order directing the Commission to grant Mo Ed's application for additional gas upon the specified conditions was to ensure that the Commission would have the same curtailment powers over indirect sales to Hercules as it presently has over such direct sales. On the other hand, the rate charged to Hercules by Panhandle is not under either federal or state regulation. The transfer of this sale to Mo Ed would place the rate charged by Panhandle for sales to Mo Ed under federal regulation. Therefore, our order will increase the Commission's regulatory powers over the sales to Hercules because it will subject to FPC rate regulation the additional Mo Ed sales necessary to meet Hercules' requirements.

█ The Commission has had a long-established policy of favoring industrial service by distributors rather than pipelines. In this single case it makes an exception. While, of course, it is within the Commission's competence to change its policy, it must, we submit, where an application is singled out, specify cogent

reasons for the exception that will stand up under close scrutiny. We believe the Commission has failed to justify its departure from established policy. Its belated attempt at justification was that the approval of Mo Ed's application would insulate the sale from the Commission's curtailment jurisdiction and would create a preference over Panhandle's other direct sale customers. We did not agree. Indeed the refusal of Mo Ed's application would constitute discrimination against the distributor, its customers and Hercules. Under the order that we have directed the Commission to enter, the source of the gas will be the same, the physical flow will be identical, the volumes will be equal, the use will be unchanged, and the power of the Commission to curtail the sale will be undiminished. The Commission has advanced no reason why its granting Mo Ed's application for additional gas cannot be conditioned upon acceptance of these terms. If Mo Ed refuses to accept such conditions, then the Commission need not approve the application. Under our disposition the sale to Hercules will differ from the present direct sale by Panhandle in only two respects: In addition to its curtailment power the Commission will also have jurisdiction over the rate charged for the additional gas now sold initially to Mo Ed, and the financial benefits of the Hercules sale will be altered. Panhandle will not be allowed to skim off the cream of this small market by serving Hercules direct. On the other hand, the local distributor Mo Ed, as a result of the new industrial demand, will increase its load factor, reduce its unit cost of gas and thus benefit all its customers. Surely this benefit to Mo Ed's customers is in the public interest. And the Commission has full power to fashion a gas curtailment order that will protect the public from any gas shortage. For these reasons our order requiring approval of Mo Ed's application must stand.