527 F.2d 1288
 Fed. Sec. L. Rep. P 95,400
INTERNATIONAL ELECTRONICS CORPORATION and Electro Motive
Corporation, Plaintiffs-Appellees-Cross Appellants,
v.
Joseph FLANZER et al., Defendants-Appellants-Cross Appellees,
J. Kevin Foley, Defendant.
 Nos. 1047, 1129, Dockets 75-7159, 75-7216.
 United States Court of Appeals,
Second Circuit.
 Argued June 19, 1975.
Decided Dec. 22, 1975.
 
 Arnold E. Buchman, Hartford, Conn. (Morris Apter, Hartford, Conn., of counsel), for defendants-appellants-cross appellees.
 J. Read Murphy, Hartford, Conn. (Murtha, Cullina, Richter and Pinney, Hartford, Conn., of counsel), for plaintiffs-appellees-cross appellants.
 Briefs amici curiae were filed by The Connecticut State Bar Assn. (Ralph G. Elliot and Alcorn, Bakewell & Smith, Hartford, Conn., of counsel); New York State Bar Assn. (Joseph H. Murphy, Albany, N.Y., of counsel); and The Assn. of the Bar of the City of New York (Lana Borsook, Robert H. M. Ferguson, Neal Johnston, James B. Lewis and Briscoe R. Smith, Committee on Professional and Judicial Ethics, New York City. of counsel).
 Before LUMBARD, GIBBONS* and GURFEIN, Circuit Judges.
 GURFEIN, Circuit Judge:
 
 
 1
 We have been met recently with a number of appeals on matters involving the disqualification of lawyer-opponents.[1] The present appeal is by the law firm for the defendants from the granting of a motion by the plaintiffs to disqualify them from representing a former partner and former clients in a litigation.[2] Such moves and countermoves by adversaries appear to have become common tools of the litigation process. We accordingly requested four bar associations, the Connecticut Bar Association, the Vermont Bar Association, the New York State Bar Association, and the Association of the Bar of the City of New York to file briefs as amici curiae. We have received briefs from all but the Vermont Bar Association. We have found them very helpful, and we thank them for their thoughtful efforts to aid the court. The Association of the Bar and New York State Bar briefs speak clearly for reversal. The Connecticut Bar brief discusses the issues more generally but is, by implication, also clearly for reversal.
 
 
 2
 * The complaint was filed in the United States District Court for Connecticut. The plaintiffs are two corporations: a parent International Electronics Corporation ('IEC') and its subsidiary Electro Motive Corporation ('EMC'). The action arises from a sale and merger transaction in which EMC (then named IECONN, Inc.) acquired for cash the assets and business of Electro Motive Manufacturing Company, Inc. ('Elmenco'), with certain payments withheld in an escrow fund. The defendants are seven individuals who were selling stockholders of Elmenco. Included among these defendants is Julius Apter. Julius Apter acted as counsel and chief negotiator for all the stockholders of Elmenco, including himself. He was an officer and director of Elmenco, as well as a stockholder. He was also trustee of seven trusts which were among the selling stockholders, as well as a trustee of a principal creditor which was required to modify its loan agreement as a condition of the sale.
 
 
 3
 Julius Apter has retired from the law firm of Apter, Nahum & Lenge ('the law firm'), in which Morris Apter and Nicholas Lenge were also partners. He is 76 years old with a degenerative eye condition and has not engaged in the practice of law since January 1974. He no longer occupies office space in the Apter, Nahum & Lenge office, no longer resides in Connecticut, has not renewed his Connecticut license to practice law and has not participated in the conduct of the case except as a party defendant.
 
 
 4
 The law firm was made a defendant as agent of an escrow fund created under the Agreement and Plan of Merger, since the escrow fund was under the joint control of IEC and the law firm; it was named 'in order that all necessary parties for a proper adjudication of this matter are before the court.' There is no claim for damages against the law firm.
 
 
 5
 The complaint alleges that the seven individual defendants, including Julius Apter, made misrepresentations during the negotiations for the sale, and claims violations of the Securities Act of 1933 and Section 10(b) of the 1934 Act, as well as common law fraud and breach of contract. In July 1974 the law firm filed a joint answer for six of the seven defendants and on its own behalf. The law firm, though only a nominal defendant, counterclaimed for legal fees principally claimed to be owing for services rendered 'at the request of the plaintiffs' during the merger.[3] Plaintiffs' reply generally denied the counterclaim.
 
 
 6
 In October 1974 the plaintiffs moved before Judge Blumenfeld to disqualify the law firm from representing any of the defendants. They alleged that Julius Apter was a partner in the law firm when the litigation was instituted in June 1974, had played the principal role in the negotiation of the sale and merger and would be a material witness. Plaintiffs moved for disqualification of the law firm on the ground that their continued involvement would violate Disciplinary Rules (DR) 5--101(B), 5--102(A), 5--105(A) and 5--105(B) of the Code of Professional Responsibility.[4]
 
 
 7
 In response, Julius Apter filed an affidavit in which he swore that he has not practiced law since January 1974 and that he had retired from the Apter firm. There seems to be no real dispute that he is no longer in the firm or practicing law.
 
 
 8
 Judge Blumenfeld, on February 27, 1975, granted plaintiffs' motion to disqualify Julius Apter and all members of the law firm from participating at trial on the ground that such disqualification would assure compliance with DR 5--101(B), but he allowed the firm to continue to conduct the pre-trial proceedings. This appeal is from the granting of the disqualification motion which appellants contend should not have been granted. Plaintiffs-appellees contend that the court should have disqualified Julius Apter and the law firm from all proceedings and not only from the trial itself. To bolster its position, plaintiffs now urge the applicability of Canons 4 and 9 which were not briefed below but which were allegedly asserted in oral argument. We shall deal with the possible applicability of these canons as well, beginning with Canon 4.
 
 II
 
 9
 The District Court made no mention of Canon 4, either because it thought it unnecessary to discuss it in light of its decision under Canon 5 or because it thought Canon 4 inapplicable to the state of facts before it. We think the court probably thought Canon 4 to be inapplicable, for its recognition would have required disqualification at once, even before trial. We agree that Canon 4 is not applicable.[5]
 
 
 10
 Under Canon 4 and its offspring, EC 4--5 and 4--6, and DR 4--101(B), a lawyer may not accept employment against a former client where the matter is substantially related to the subject-matter of his earlier representation.[6] We have emphasized that we will not tolerate any deviation from the time-honored ethic of not revealing or using the confidences of a former client. See Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751 (2 Cir. 1975); Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (2 Cir. 1973); Hull v. Celanese Corp., 513 F.2d 568 (2 Cir. 1975); Ceramco, Inc. v. Lee Pharmaceuticals, 510 F.2d 268 (2 Cir. 1975); General Motors Corp. v. City of New York, 501 F.2d 639 (2 Cir. 1974). Indeed, most of our cases involving the Canons have arisen under Canon 4.
 
 
 11
 Assuming that the corporation now defunct as a result of merger is still a 'client' deserving of protection for its confidences, there is no claim here that the law firm seeks to represent a third party against the successor by merger and to use its secrets to the advantage of the third party. Cf. Opinion No. 395, New York State Bar Association (1975); Informal Opinion No. 516, Comm. on Ethics and Professional Responsibility, American Bar Association (1962). While in form the transaction here involved ended in a merger, it was, in a practical sense, a sale. The law firm and the plaintiffs were on opposite sides of the negotiations which were conducted at arm's length. The plaintiffs' attack is now on the bona fides of the selling stockholders. These defendants--the selling stockholders--not the buyer, were the clients of the law firm. They have a right to defend themselves as adversaries. An attack on their counsel may even permit the divulging of confidences in defense. DR 4--101(C)(4); Marco v. Dulles, 169 F.Supp. 622 (S.D.N.Y.), appeal dismissed, 268 F.2d 192 (2 Cir. 1959); Meyerhofer v. Empire Fire & Marine Ins. Co., 479 F.2d 1190 (2 Cir.), cert. denied, 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974). The earlier relationship of the law firm to the merged corporation cannot be a source of disqualification in these circumstances, even though a former client is surely entitled to protection. Cf. EC 4--6; Emle Industries, Inc. v. Patentex, Inc., supra.
 
 
 12
 Nor by the counterclaim for fees does the law firm adopt the status of counsel to the plaintiffs. The claim of the law firm is not that they earned fees for representing the plaintiffs, but that the plaintiffs had allegedly agreed to payment of their fees for work in the merger as a part of the purchase price.
 
 
 13
 Since the issues involved in the counterclaim may tend to confuse the issues in the main case, we suggest that the District Court accept the offer of the defendant law firm to sever the counterclaim from the trial.[7]
 
 
 14
 We hold, accordingly, that on this record there is no basis for disqualification of the law firm under Canon 4. The amici curiae, the Association of the Bar of the City of New York and the New York State Bar Association have recommended this conclusion. The Connecticut Bar brief has a similar thrust. We leave Canon 9 for discussion in Part III of the opinion.
 
 III
 
 15
 We have concluded that DR 5--101(B) and DR 5--102 do not disqualify the law firm from representing Julius Apter at trial.[8] These Disciplinary Rules are set out in the margin.[9]
 
 
 16
 These rules have been adopted by the Connecticut Superior Court, effective October 1, 1972. DR 5--101(B)(4) as formulated by the American Bar Association permits a lawyer to testify 'as to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.' We note that this exception in the ABA Code has been repealed by the Connecticut Superior Court. The repeal was adopted to reinstate the stricter rule laid down in E. M. Jennings Co. v. Di Genova, 107 Conn. 491, 498--99, 141 A. 866, 868--69 (1928), cited by the court below. While Local Rule 2(f) of the Connecticut District Court 'recognizes the authority of the Code of Professional Responsibility of the American Bar Association (as approved by the Judges of the Connecticut Superior Court as expressing the standard of professional conduct expected of lawyers),' the district court noted in the opinion below that 'there is no statutory obligation upon the federal courts to apply the Disciplinary Rules of the Code of Professional Responsibility . . . in deciding motions to disqualify counsel . . ..'
 
 
 17
 The brief of the Connecticut Bar Association comments:
 
 
 18
 'It behooves this court, therefore, while mindful of the existing Code, to examine afresh the problems sought to be met by that Code, to weigh for itself what those problems are, how real in the practical world they are in fact, and whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more harm than good, by requiring the client and the judicial system to sacrifice more than the value of the presumed benefits.'
 
 
 19
 (Br. p. 7).
 
 
 20
 We approach the problem presented in much the same spirit. J. P. Foley & Co. v. Vanderbilt, 523 F.2d 1357 (2 Cir. 1975) (and see concurring opinion of Gurfein, J., at 1359). The district court described the issue as 'whether Julius Apter or any member of the firm of which he is or was a member ought to be permitted to act as counsel at a trial where it is obvious that he will be called to testify as a witness to matters which will be in dispute' (emphasis added).
 
 
 21
 We assume from the sworn statement of Julius Apter that he has not practiced law since January 1974 and is no longer a member of the law firm.
 
 
 22
 The narrow issue is, therefore, whether a former partner in a law firm who is a party defendant in a lawsuit growing out of his former activities as a member of the law firm is barred from retaining the law firm as trial counsel because he will have to be a witness at the trial.
 
 
 23
 The district court posited that 'the ethical obligations of all members of a law firm are treated as joint and several,' relying upon E. M. Jennings Co. v. Di Genova, supra. The district court apparently believed that the emphasis in that case upon what 'the public will be apt to think' applied as well to the representation of a lawyer who was no longer in the firm.
 
 
 24
 We note first that the present Disciplinary Rules are a recent extension of the old Canon 5 which did not disqualify partners of a lawyer-witness from acting as trial counsel.
 
 
 25
 Second, the literal language of DR 5--101(B) and 5--102 does not specifically prohibit a firm from appearing as trial counsel where a former partner may be a witness. The trust is to the contrary: 'or a lawyer in his firm.'
 
 
 26
 Third, in searching for the rationale of the Rule, we must consider the ethical consideration which underlies it. The arguments for disqualification of the attorney from acting as trial counsel when he, himself, is to be a material witness have been variously stated. See 6 Wigmore on Evidence § 1911 (3d ed. 1940). The ultimate justification for the disqualification rule, in Wigmore's view, was that the public might think that the lawyer is distorting the truth for the sake of his client. Another argument for disqualification is that the lawyer-witness will vouch for his own credibility in summing up to the jury--a powerful means of support for his own credibility. The argument that such tactic is to the detriment of his client obviously defeats itself. But the argument that it is unfair to the opponent has some merit. It is difficult, indeed, to cross-examine a witness who is also an adversary counsel concerning matters of fact, and, more particularly, on matters impeaching his credibility, within the bounds of propriety and courtesy owed to professional colleagues.
 
 
 27
 Taking these ethical justifications in order, we do not think that they apply where the lawyer-witness is not only no longer a member of the firm but is also a party defendant.
 
 
 28
 It is quite clear that Julius Apter will be impeached for interest because he is a party defendant whom the plaintiffs are trying to hold in damages. His status as a former lawyer can hardly add to his obvious interest in fending off an award of damages. If the public, as Wigmore worried, might suspect him of distorting the truth it would not be because he is a lawyer but because he is a defendant. There is no possibility that Julius Apter can be taken to be a disinterested witness.
 
 
 29
 Almost every party to a civil lawsuit (and his agents) is suspect of stretching the truth for his own cause, and to the most cynical, the very service of the complaint is a prelude to perjury. When we deal with what the public thinks, we must be careful not to accept the view of the most cynical as the true voice of the public, lest we accept a lack of faith in our institutions as a categorical basis for restricting otherwise quite ethical conduct.
 
 
 30
 We need not be concerned that Julius Apter will unfairly vouch for his own credibility, for he will not be the advocate at trial. He will say no more than the trial judge permits him to say upon his oath. Since Julius Apter has already been stigmatized in the complaint as a purveyor of fraudulent misstatements, it is apparent that there will be no inhibiting factor in his impeachment on the witness stand simply because he is represented by his former firm. As the City Bar Association suggests,
 
 
 31
 '(i)f Julius Apter should eventually prove plaintiffs' case out of his own mouth, we think the legal profession would suffer no loss of statute from a public awareness of the fact that Julius Apter was once a partner in the Apter firm.'
 
 
 32
 (Bar Assn. Br. p. 16).
 
 
 33
 In sum, we find no ethical justification for disqualification of the law firm from representing at trial its former partner Julius Apter as a party defendant.
 
 
 34
 From what we have said, it must be clear that we do not think the question of 'appearances' under Canon 9 is particularly acute in this case. We caution, as the Connecticut Bar Association urges us to do, that Canon 9, though there are occasions when it should be applied, should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules.
 
 
 35
 We think closer in point than resort to Canon 9 is the argument that Julius Apter is not a mere witness and is, hence, not covered by DR 5--101(B) and 5--102(A). We think the statute, 28 U.S.C. § 1654, to be more relevant than Canon 9. Section 1654 provides:
 
 
 36
 'In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct such causes therein.'
 
 
 37
 It is implicit that a lay party may not only try his own case but also testify on his own behalf. We do not think that because he is a lawyer he should be deprived of that right. By the same token, he should be entitled to counsel of his own selection, including a law firm of which he was formerly a partner. We need not now decide, however, whether this would be the rule if Julius Apter were still a member of the firm.
 
 IV
 
 38
 Lastly, however, we must advert to a problem not raised by the parties either below or on appeal. We refer to the representation by the law firm of five other defendants in addition to Julius Apter. A lawyer undertaking multiple representation must be mindful of EC 5--14 through 5--17, DR 5--101(A) and DR 5--105.[10]
 
 
 39
 It is provided in DR 5--105(C) that a lawyer may represent multiple clients only if it is 'obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.' And DR 5--101(A) provides:
 
 
 40
 'Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests.'
 
 
 41
 We have expressed the view that in criminal cases the same counsel should generally not be assigned to represent co-defendants since a conflict of interest may arise in the trial. We have also sanctioned a procedure through which the trial judge may inquire in private about the possible conflict of interest. See Morgan v. United States, 396 F.2d 110, 114 (2 Cir. 1968) (Lumbard, Chief Judge).
 
 
 42
 We think the same considerations apply in civil cases with multiple defendants where one of the defendants was formerly a member of the law firm which represented all the defendants in a transaction that is the subject of suit.
 
 
 43
 When a lawyer and fellow directors of a corporation are joint defendants and the lawyer's firm tries the case for all, there is danger of a conflict of interest if the directors should contend that they did only what counsel said was lawful, and if counsel should contend that he wrote only what the directors told him was true.
 
 
 44
 If Julius Apter should assert that he believed the representations made to him by his co-defendants, the presence of his former firm as counsel for those co-defendants might conceivably inhibit their defense. If such conflict should occur, the law firm as trial attorneys for Julius Apter might be required to cross-examine their own clients who are co-defendants.
 
 
 45
 The hypothesis of conflict may be farfetched in this case. All the defendants may have a common defense that the alleged misrepresentations were true when made. We will leave it to the discretion of the trial judge to explore the problem adequately with the several defendants, acquainting whem with the issue, and inquiring in private, without the presence of the plaintiffs, what their wishes are with respect to representation after full disclosure.
 
 V
 
 46
 Perhaps in retaliation for the attack upon them, the Apter firm moved to disqualify the plaintiffs' attorneys, Murtha, Cullina, Richter and Pinney, from acting as trial counsel in the present action. The motion was based on the following facts.
 
 
 47
 Donald Richter, a partner in the Murtha firm, is attorney for the Estate of Samuel Raskin. Morris Apter of the firm of Apter, Nahum & Lenge is a co-executor under the will of Samuel Raskin. In his capacity as attorney for the Estate, Richter represents Morris Apter as a fiduciary. Morris Apter is a defendant in the International Electronics action because of his position as Escrow Agent.
 
 
 48
 The Apter firm took the position that a law firm (Murtha) cannot represent a party (IEC) in suing another client of the firm (Morris Apter). Judge Blumenfeld refused to disqualify the Murtha firm partly on the ground that Mr. Richter is acting as attorney for the estate rather than for Mr. Apter individually. We agree that the motion was properly denied principally because Morris Apter is being sued only in his capacity as an Escrow Agent in order to bring in all necessary parties. We need not consider what the situation would have been if Morris Apter had been a client of the Murtha firm in his own capacity and that firm had sued him personally for damages on behalf of another client in an unrelated matter. Cf. Grievance Comm. of Bar of Hartford County v. Rottner, 152 Conn. 59, 203 A.2d 82 (1964).
 
 
 49
 The denial of the motion to disqualify the Murtha firm is affirmed.
 
 
 50
 The granting of the motion to disqualify the Apter firm is reversed, and the matter remanded for further consideration in conformity with this opinion.
 
 
 
 *
 Of the U.S. Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 We have held orders denying disqualification as well as orders granting disqualification to be appealable. Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 496 F.2d 800 (2 Cir. 1974) (en banc)
 
 
 [2]
 There is also an appeal by the same law firm from an order denying their counter-motion to disqualify the law firm which is acting for the plaintiffs. We deal with this at the end of the opinion
 
 
 [3]
 Of the amount claimed, $8,755 was alleged to be an unpaid balance of the law firm's retainer before the merger, and the remainder for services rendered 'at the request of the plaintiffs' in connection with the merger. The law firm contends that since it was named a defendant it had no recourse but to assert the claim for fees as a compulsory counterclaim. F.R.Civ.P. 13(a)
 
 
 [4]
 DR 5--105(A), (B) provide:
 'DR 5--105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.
 '(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5--105(C).
 '(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5--105(C).'
 See note 9 infra for text of DR 5--101(B) and 5--102(A).
 
 
 [5]
 The motion for disqualification of the Apter firm alleged violation of only DR 5--101(B) and 5--102(A), making no mention of DR 4--101(B) or EC 4--5 and 4--6. To avoid a new motion based on DR 4--101(B), we express our views in response to appellees' argument on appeal
 
 
 [6]
 EC 4--5 and EC 4--6 provide:
 'EC 4--5 A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes. Likewise, a lawyer should be diligent in his efforts to prevent the misuse of such information by his employees and associates. Care should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to another, and no employment should be accepted that might require such disclosure.
 'EC 4--6 The obligation of a lawyer to preserve the confidences and secrets of his client continues after the termination of his employment. Thus a lawyer should not attempt to sell a law practice as a going business because, among other reasons, to do so would involve the disclosure of confidences and secrets. A lawyer should also provide for the protection of the confidences and secrets of his client following the termination of the practice of the lawyer, whether termination is due to death, disability or retirement. For example, a lawyer might provide for the personal papers of the client to be returned to him and for the papers of the lawyer to be delivered to another lawyer or to be destroyed. In determining the method of disposition, the instructions and wishes of the client should be a dominant consideration.'
 DR 4--101(B) provides:
 'DR 4--101 Preservation of Confidences and Secrets of a Client.
 '(B) Except when permitted under DR 4--101(C), a lawyer shall not knowingly:
 '(1) Reveal a confidence or secret of his client.
 '(2) Use a confidence or secret of his client to the disadvantage of the client.
 '(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.'
 
 
 [7]
 We do not pass on whether the law firm when it was sued merely as escrow agent was compelled to make its claim for legal fees as a compulsory counterclaim under Rule 13(a), as it contends
 
 
 [8]
 We discuss the representation of the other selling stockholder defendants in Part IV
 
 
 [9]
 Disciplinary Rules DR 5--101(B) and DR 5--102 read as follows:
 'DR 5--101 Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.
 '(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:
 '(1) If the testimony will relate solely to an uncontested matter.
 '(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
 '(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
 '(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.
 'DR 5--102 Withdrawal as Counsel When the Lawyer Becomes a Witness.
 '(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5--101(B)(1) through (4).
 '(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.'
 
 
 [10]
 EC 5--14 through EC 5--17 provide:
 'EC 5--14 Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant.
 'EC 5--15 If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests, and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially. On the other hand, there are many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involving litigation. If the interests vary only slightly, it is generally likely that the lawyer will not be subjected to an adverse influence and that he can retain his independent judgment on behalf of each client; and if the interests become differing, withdrawal is less likely to have a disruptive effect upon the causes of his client.
 'EC 5--16 In those instances in which a lawyer is justified in representing two or more clients having different interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent. If there are present other circumstances that might cause any of the multiple clients to question the undivided loyalty of the lawyer, he should also advise all of the clients of those circumstances.
 'EC 5--17 Typically recurring situations involving potentially differing interests are those in which a lawyer is asked to represent co-defendants in a criminal case, coplaintiffs in a personal injury case, an insured and his insurer, and beneficiaries of the estate of a decedent. Whether a lawyer can fairly and adequately protect the interests of multiple clients in these and similar situations depends upon an analysis of each case. In certain circumstances, there may exist little chance of the judgment of the lawyer being adversely affected by the slight possibility that the interests will become actually differing; in other circumstances, the chance of adverse effect upon his judgment is not unlikely.'